In re OPTI–GAGE, INC., Debtor.

Walter CAVENDER, Donna Cavender, Movants,

v.

AMERITRUST CO., N.A., Respondent.

Bankruptcy No. 3–90–02798.

United States Bankruptcy Court, S.D. Ohio, W.D.

Feb. 28, 1991.

Richard A. Setterberg and Thomas Barnhart, Dayton, Ohio, for Walter and Donna Cavender.

Philip E. Langer and Gregory P. Garner, Dayton, Ohio, for Ameritrust.

## DECISION AND ORDER FOR RECOVERY OF EXPENSES OF DISPOSING OF PROPERTY BENEFITING THE HOLDER OF A SECURED CLAIM

WILLIAM A. CLARK, Bankruptcy Judge.

This contested matter is before the court upon the motion of Donna Cavender for the court to order the payment of reasonable rent, taxes and damages to the property which has occurred post-petition. The motion was contested by Opti-Gage, Inc., and Ameritrust Co., N.A., which will be referred to as "the Bank." However, only Ameritrust actively opposed the motion at the hearing and was represented at the hearing.

This matter is a contested matter arising in this bankruptcy case, referred to this court by the standing order of reference entered in this district. The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The court is authorized to enter a final judgment in this matter.

The following decision constitutes the court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

The parties have entered into an agreed pre-hearing order and entry stating the claims of Donna Cavender and the claims of the Bank. Agreed facts are incorporated in the pre-hearing order. The contested facts and law are also recited in the agreed order. The court wishes to thank counsel for their efforts in arriving at that particular order because it has facilitated the work of the court, and I trust, the work of counsel in the case.

In reaching its determination, the court has considered the demeanor and credibility of all the witnesses who testified. Those include Walter Cavender, Donna Cavender by deposition, Robert Hickey, Thomas M. Barnhart, II, Jerry Colp, James Whiting and Mark Dlott. The court also

considered all of the Exhibits admitted into evidence, including Cavender Exhibits 1 through 10 and Ameritrust's Exhibits I and II.

The court has reviewed a series of legal authorities which will be referenced in an abbreviated form during the remainder of this decision. Those authorities which the court found helpful in the determination herein and were reviewed are the following: *In re Cardinal Industries, Inc.*, 109 B.R. 738 (Bankr.S.D.Ohio 1989); *Geller v. International Club Enterprises, Inc. (In Re International Club Enterprises, Inc.)*, 105 B.R. 190 (Bankr.D.R.I.1989); *In re Dixie Fuels, Inc.*, 52 B.R. 26 (Bankr.N.D.Ala. 1985); *Witham v. Southside Building and Loan*, 133 Ohio St. 560, 15 N.E.2d 149 (1938); *Montalto, et al v. Yeckley*, 143 Ohio St. 181, 54 N.E.2d 421 (1944).

The debtor, Opti–Gage, was not represented at the hearing, apparently by recognition that the central issue in this case is the responsibility of a secured creditor to pay the reasonable and necessary costs and expenses of preserving or disposing of property in which it claims a security interest to the extent of benefit to the secured creditor.

The Bank's responsibility as a secured creditor to pay the costs commensurate with the benefit received is derived from § 506(c) of the Bankruptcy Code which provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c).

The *International Club* case, 105 B.R. 190, recognizes the right of lessors' standing to bring a direct claim against a secured creditor for the costs of preserving the collateral pursuant to § 506(c).

■ In this case, the Cavenders have standing to bring this claim against the Bank for the costs of preserving and selling the collateral to benefit the Bank by applying the sale proceeds to the loan obligation of Opti–Gage, Inc.

■ The contract lease rate is not necessarily determinative of the amount of the administrative claim. After the lease is deemed rejected, the lease rate no longer controls. Instead the debtor is only required to pay the reasonable rental value of the premises. *In re Cardinal*, 109 B.R. 738. In this case the reasonable value for the use of the premises is limited to the benefit such use gave to the Bank.

The claim arose from the fact that a substantial amount of personal property, which is collateral of the bank, remained in the premises owned by the Cavenders after the rejection of the lease by Opti–Gage. Rent was paid to October 31, 1990. Opti–Gage, with considerable aid and advice from the Bank, sold all the saleable collateral on September 19, 1990. Much of the machinery and equipment sold remained in the premises for removal by the buyers until October 12, 1990. On October 13, 1990 Walter Cavender, for Donna Cavender, received the keys from James Whiting, employee of Opti–Gage. A considerable amount of unsold equipment, or abandoned equipment remained in the premises after October 12, 1990, and to the date of the hearing in this case.

■ The court must determine the factual issue of whether the Bank benefited, and for what period of time, from the use of the premises for storing, demonstrating, and selling the equipment and machinery which was its collateral, and which was of benefit to the Bank. The court finds that the preservation of the collateral at the premises until the sale, and removal after the sale, was of benefit to Ameritrust. Ameritrust is responsible for the costs attendant to that benefit, i.e. the benefit of the receipt of proceeds from the sale of the collateral.

■ An additional issue is the element of damages to the building caused by the buyers in the removal of machinery and equipment, and whether such damages were a benefit to the bank. The sale was not complete until the purchasers removed the

machinery and equipment. Therefore, such damages must be included in the amount the secured creditor must pay in recognition of the benefit the secured creditor obtained by selling the equipment and machinery. The completed sale included the delivery or removal of the equipment and machinery sold. The attendant cost must be paid by the Bank.

■ In determining the amount of the rent, the court must determine the period of rental which benefited the Bank. The period from September 1, 1990 to October 12, 1990 is clearly a part of the sale process for which the Bank is responsible. To extend the period beyond October 12, 1990, the Cavenders had the burden to prove what benefit the Bank received after that date.

Walter Cavender was aware that James Whiting, Opti–Gage's employee, had left the building as of October 12, 1990. Mr. Cavender knew that James Whiting's last day of employment was that date. James Whiting called Mr. Cavender and advised that a set of Opti–Gage keys were in the key box at the premises on October 13, 1990. Walter Cavender inspected the premises, noted its dreadful condition, and took, or had taken, a number of photographs which were introduced in the case as Cavender's Exhibit 3. Neither of the Cavenders, that is Walter Cavender or Donna Cavender, contacted the Bank to resolve the apparent question of whether the Bank was finished with the building. Mr. Barnhart, attorney for the Cavenders, made several telephone calls to Opti–Gage's counsel, and to counsel for the Bank during the next month, without stating the reasons for the calls. The calls were not returned. Counsel for the Bank and Cavenders' counsel were involved in other important matters dealing with the Opti–Gage bankruptcy during this period.

There is no showing of other steps the Cavenders took to obtain possession of the building. Walter Cavender did transfer electricity to his wife's name about November 1, 1990, and continued the insurance coverage in the name of Donna Cavender after October 1, 1990. The Cavenders apparently took no other action to take possession of the premises.

■ A landlord, as the owner of a vacated building upon which there is no lease or rental agreement, has the right to take possession if that landlord follows steps provided by the law. In a bankruptcy case, the first step is to obtain relief from stay in order to bring forcible detainer proceedings to recover legal possession.

Neither Opti–Gage nor the Bank asked the Cavenders to forebear from retaking the property after October 12, 1990. The premises were in a "terrible condition" after October 12, 1990. A reasonable conclusion from viewing of the building, the pictures of the interior (Exhibit 3), is that the building was "abandoned."

While the Bank's counsel's failure to answer calls made by the Cavenders' attorney is disrespectful and a discourtesy, and for which the court sees no excuse, that failure to return calls does not indicate anything positive relative to possession of the subject property. An inference may arise that neither Opti–Gage nor the Bank cared anything more about the building or the contents of the building. There may also be an inference that because equipment was in the building perhaps further use was intended by Opti–Gage or the Bank.

The Cavenders were in the dilemma which many landlords face when a tenant vacates the premises and leaves property behind. The Cavenders' ineffective attempts to gain information and failure to act to take possession amount to insufficient evidence to sustain their burden of showing any benefit to the Bank by the use of the building after October 12, 1990.

Neither the Bank nor Opti–Gage entered the building nor gained any benefit from the building or the remaining contents after October 12, 1990.

■ The court must now consider the amount of rent the Bank should pay for the benefit received in the use of the building until October 12, 1990.

Jerry Colp, the appraiser for the Cavenders, testified that the value of the lease

was $3.50 per square foot, or $3.25 per square foot, for the 52,500 square feet used by the Bank for the sale of the machinery and the equipment. The court finds that the Bank used the entire building for storage of the equipment until the sale and to demonstrate the equipment prior to the sale. There was no attempt, probably because of the difficulty in moving the equipment, to compact the equipment into a smaller space.

Jerry Colp relied upon certain comparable sales on which he based the opinion that the lease rate was $3.25 to $3.50 per square foot. The court notes that all of those "comparable" sales, used as a basis for his opinion, were in a better location, having better proximity to an interstate highway, and in addition a number had higher ceilings in the premises which would facilitate more flexible manufacturing or warehousing uses. For these reasons those comparable leased premises explained in Cavenders' Exhibit 7 do not persuade the Court of the fair market value of a lease for the subject property.

The testimony of Mark Dlott, appraiser for the Bank, placed the fair market lease value of the subject premises at between $1.50 to $2 per square foot for the subject property.

The amended lease, in March 1989, between the Cavenders and Opti–Gage, was for the identical property and was based on a rate of $1.68 per square foot when considering the net, net, net nature of the lease. This lease, the court finds, is persuasive as to the fair lease value of these premises. The court considered the testimony that the economic climate in March 1989 was probably more favorable to the owner than the economic climate in the summer and fall of 1990, so that it is unlikely that the rental value would have been higher in the fall of 1990 for these premises. The testimony made it clear that there was no difference in rental rate for the use of the premises as storage or as manufacturing space.

The court is persuaded that the amended lease rate of $12,000 per month, net, net, net, is a fair market lease rental value. This rental calculates to $1.68 per square foot for the 52,500 square feet used by the Bank.

The building was used for the storage and eventual sale of machinery and equipment for 42 days to October 12, 1990. The mathematical calculation for the leased space used, at the $1.68 per square foot rate for 52,500 square feet, is $241.65 per day for those 42 days. The total rent is $10,149.30.

■ The court finds that the building was damaged by purchasers, or in order for purchasers to remove the machinery and equipment purchased at the auction which benefited the Bank. The benefit to the Bank resulting from the sale of the property negates any limitation on the Bank's obligation based upon the fund developed from the collection of accounts receivable. The Bank benefited from the sale of the merchandise and equipment, and, under Bankruptcy Code Section 506(c), the fund created by the sale proceeds is the source from which the payment of the costs must be made to pay for the Bank's benefit.

The court has considered the claims for damages in the twelve items contained in the agreed pretrial order. All of those damages, which have been proved to have resulted from the removal of equipment at or after the sale, must be considered as cost of the sale for which the Bank is responsible. The evidence is clear that all of those twelve items resulted from the action of the removal of equipment and machinery. The amounts which the court finds to be reasonable do differ from the testimony of Mr. Hickey and James Whiting. The testimony of Robert Hickey, the builder who estimated the cost of repairs, is persuasive as to the cost of repairs as to all of the items of damage except for the damage for item 4, broken and missing acoustical tiles at $1,000, item 5, rust stains on the sidewalk for $150, item 8, damage to walls in twelve areas at $1500, and item 9, damage to driveways and pavements caused by trucks and cranes. The last item is dependent upon the estimate of Otha

Jones, which is contained in Cavenders' Exhibit 6.

The court finds reasonable the uncontroverted testimony of Robert Hickey as to the necessity for professional workmanship, and the cost of such workmanship, to repair the 13 holes in the roof for $2200, removal of dangling electrical wires in 25 areas for $1600, reconstruction of the sawed-out walls in 5 places for $250, to clean the clutter and debris on the floors for $200, to remove pipes projecting above the floor in 10 locations for $250, to replace missing fire extinguishers for $210, to rehang or replace doors for $250, and to replace broken plumbing trench gratings for $750. The court finds unreasonable Mr. Hickey's estimate of the cost to replace broken and missing acoustical ceiling tiles in 6 areas for any amount more than $100, because James Whiting testified the cost of such acoustical tile is $2 per tile, and replacement is simply a matter of dropping them in place in the structure holding them. The plating function caused the discoloration of the metal structure, not the action of any purchaser. The rust stains on the sidewalk and driveway can be removed for not more than $100, with particular attention only to the stains on the sidewalk. The blacktop will be worn of rust or will be re-coated to cover any rust there within that amount of money, $100. The repair of damaged walls, item 8, includes painting in the Hickey estimate which is duplicative of the usual cost a landlord incurs when the premises are relet. So, the wall damage allowable is $500.

The damage in item 9 to driveways and pavements must be limited to patching all the holes in the parking lot and grading, for a total sum of $650. The sidewalk replacement and cleanup and hauling of debris were not damages relating to the sale, but resulted in the operation of the manufacturing function by Opti–Gage as is evidenced to the court by the photographs taken in July 1990, prior to the sale, and evidenced in Ameritrust's Exhibit II. Those pre-auction sale pictures, Ameritrust's Exhibit II, show the damage to the sidewalk, growing weeds, debris, and clutter in the rear of the building.

The court finds the following damages as costs which benefited the Bank:

| | | |
|---|---|---|
| 1. | Thirteen holes in the roof | $2,200.00 |
| 2. | Dangling wires in 25 areas | 1,600.00 |
| 3. | Sawed-out walls in five places | 1,250.00 |
| 4. | Broken and missing acoustical tiles in 6 areas | 100.00 |
| 5. | Rust stains on the sidewalk | 100.00 |
| 6. | Clutter and debris on the floors | 200.00 |
| 7. | Pipes projecting above the floor in 10 locations | 250.00 |
| 8. | Damages to walls in 12 areas, with no amount for painting | 500.00 |
| 9. | Damage to driveways and pavements caused by trucks and cranes | 650.00 |
| 10. | Missing fire extinguishers in 6 areas | 210.00 |
| 11. | Removal of doors and their replacement | 250.00 |
| 12. | Broken plumbing trench gratings in 8 locations | 750.00 |

For such damages the Bank shall be ordered to pay $8,050.

In consideration of the matter of setoff for costs incurred by the Bank in paying for the removal of toxic waste, the court is persuaded that the Bank received benefit from that $8000 expenditure by avoiding any governmental agency stopping the sale of machinery and equipment at the auction. The action of the Bank in expending that sum was a prudent decision which avoided any regulatory prohibition against the sale of machinery and equipment located in the premises. The fact that the owner of the premises may benefit does not diminish from the benefit to the Bank in the timely manner required if the Bank were to realize the proceeds of the auction sale.

To the extent Donna Cavender has not been compensated for the damages caused by Opti–Gage, the debtor in possession, she is granted the right to file a claim against the estate for that difference in damage, providing such claim is filed within thirty days from this date.

■ The Bank has filed a motion to strike a reference to Ameritrust's offer to settle the amount of rent owed for cost of the removal of toxic waste. The court finds such motion is well taken because an offer to settle is not a proper pleading or the subject of testimony, and the reference to such settlement offer is stricken.

■ The Court now considers the matter of the setoff by the Bank for the Cavenders' guaranty obligation of up to $400,000.

■ Setoff is an equitable matter and is not a matter of right; instead it is granted at the discretion of the court. *Witham v. Southside Building and Loan,* 133 Ohio St. 560, 15 N.E.2d 149 (1938), and *Montalto v. Yeckley,* 143 Ohio St. 181, 54 N.E.2d 421 (1944).

■ In general, one of the essential prerequisites to setoff is mutuality, that is, the claims or debts must be owing between the same parties in the same right or capacity. Here, the court finds that although formal mutuality may be present, "functional" mutuality is not present.

Typically, under Section 506(c) of the Bankruptcy Code, it is the trustee that recovers "from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." Clearly, had a trustee brought this action, the Bank would not be permitted a setoff against the trustee of the alleged debt owing from the creditor to the Bank.

In the exercise of its discretion, the court can think of no equitable reason to grant the Bank a setoff in the instant matter merely because the creditor has found it necessary to file the Section 506(c) action rather than the trustee. There is no functional mutuality here because in reality the creditor has merely undertaken a traditional role or function of a trustee, that is, the creditor then may be viewed as performing in the capacity of a trustee, and the Bank is in essence being required to pay a trustee under Section 506(c), and not the creditor directly.

The Court grants, as a judgment, and orders Ameritrust Bank to pay to Donna Cavender $10,149.30 for rent for 42 days, and the sum of $8050 for damages caused to the premises resulting from the auction sale activity. The total amount due and payable and ordered paid is $18,199.30.

IT IS SO ORDERED.