In re NUTRI/SYSTEM, INC., Debtor.

MB LIMITED PARTNERSHIP, Donald L. Smith and Virginia L. Vanmaanen, doing business as Whittier Plaza, Allies Amboy Company, Washington Mutual Savings Bank, Ansel Properties, Inc., Angelo S. Mallozzi, Westmont Enterprises, Preef Mid America/East–V Rosedale Square, Inc., the Clinton Employment Lender Associates, L.P., Harlington Realty Corporation, the J.S. Company, Foothill & La Crescenta Associates, and Morse Road Company, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

NUTRI/SYSTEM, INC., Heico Acquisition Co., Inc., Heico Cosmetic, Inc., formerly Heico Food Acquisition, Inc., NSI Debt, Inc., and NSI Acquisition Limited Partnership, Defendants.

In re NUTRI/SYSTEM OF FLORIDA ASSOCIATES, Debtor.

ANSEL PROPERTIES, INC. and Preef Mid America/East–IV, Inc., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

NUTRI/SYSTEM OF FLORIDA ASSOCIATES, Heico Acquisition Co., Inc., Heico Cosmetic, Inc., formerly Heico Food Acquisition, Inc., NSI Debt, Inc., and NSI Acquisition Limited Partnership, Defendants.

Bankruptcy Nos. 93–12725DAS, 93–14121DAS.
Adv. Nos. 93–0941DAS, 93–0942DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

July 8, 1994.

Nicholas J. LePore, III, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for debtors.

Howard T. Glassman, Andrew D. Bershad, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for plaintiffs.

Bruce Sperling, Sperling, Slater & Spitz, Chicago, IL, for Heisley entities.

John Francis Gough, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Franchisees' Committee.

Donald Harrison, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Bank Group.

Robert A. Hendricks, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, David N. Ravin, Ravin Sarasohn Cook Baumgarten Fisch & Baime, Roseland, NJ, for Creditors' Committee.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The two instant adversary proceedings ("the Proceedings"), permitted to be main-

tained as class actions pursuant to Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 7023 and Federal Rule of Civil Procedure ("F.R.Civ.P.") 23(b)(3), represent efforts by the named plaintiffs, on behalf of all former landlords of the Debtors' stores ("the Landlords"), to recoup lost administrative rents from a group of companies which were involved in the acquisition of the Debtors' assets, under three theories of liability. First, the Landlords seek to subordinate the secured claim of purchaser-entity to their own claims pursuant to 11 U.S.C. § 510(c) ("Counts I"). Next, the Landlords seek to pierce the corporate veil of the Debtors in order to recover their claims from the producer defendants ("Counts II"). Finally, the Landlords seek to surcharge the purchasers' collateral in an amount equal to their administrative claims pursuant to 11 U.S.C. § 506(c) ("Count III").

This is our third decision involving the Proceedings. On March 23, 1994, in a Memorandum and Order reported at 1994 WL 96963 ("*Nutri/System I* "), we denied the Defendants' Motion to Dismiss the Complaints ("the Motion to Dismiss"). On May 10, 1994, we in turn denied the Landlords' Motion for Summary Judgment on Counts III in a Memorandum and Order reported at 1994 WL 199540 ("*Nutri/System II*"). At long last, we consider the merits of the Complaints and find them lacking. We will therefore enter judgment on behalf of all of the Defendants on all three Counts. With these Proceedings disposed of, we will now also proceed to dismiss the Debtors' main bankruptcy cases.

### B. PROCEDURAL AND FACTUAL HISTORY

The Proceedings were filed on December 22, 1993, in the companion Chapter 11 cases of NUTRI/SYSTEM, INC. ("N/S") and NUTRI/SYSTEM OF FLORIDA ASSOCIATES ("N/SF," and with N/S, "the Debtors"). Named as defendants, in addition to the Debtors in the identical Second Amended Complaints filed in each of the N/S and N/SF bankruptcy cases ("the Complaints"), were several entities controlled and owned by Michael Heisley ("Heisley") which played a role in the acquisition of the Debtors' assets, namely HEICO ACQUISITION CO., INC. ("HAC"); HEICO COSMETIC, INC. formerly known as HEICO FOOD ACQUISITION, INC. ("HFA"); NSI DEBT, INC. ("NSI"); and NSI ACQUISITION LIMITED PARTNERSHIP ("NSILP," and with HAC, HFA and NSI, "the Heico Defendants"). Basically, the Landlords assert that they are holders of administrative rent claims against the Debtors' estates, and they seek to recover these claims from the perceived deep pockets of the Heico Defendants.

The relevant factual histories of these Proceedings began in 1991, when N/S, which operates and franchises weight loss centers that administer weight loss programs and sell diet food products which complement those programs, feeling the pinch of financial difficulties spurred by tort litigation filed by some of its former customers, began a search for investors in, or purchasers of, its business. In order to facilitate this search, a broker was hired in 1992, which was ultimately replaced in this capacity, in January, 1993, by a division of a national accounting firm, Arthur Andersen & Co. ("AA"). It was through AA, and specifically AA's then-employee Brian Haveson, who later became an employee of at least one of the Hesco Defendants and is presently an employee of NSILP, that N/S was introduced to Heisley, among others, as a possible purchaser of N/S. Also at this time, N/S was considering other purchase/investment proposals. None of the purchase offers, including the Heisley proposal,[1] would have come close to retiring N/S's senior secured debt owed to the Bank Group, which totalled approximately $40 million. In fact, the proposals ranged from a low of $10 million to a high of $21 million,

---

1. Heisley proposed to acquire the assets of N/S for $12.5 million either by purchasing N/S's senior secured debt and then foreclosing on the assets or by purchasing the assets outright, free and clear of all liens, at an 11 U.S.C. § 363(b) sale. *But see* pages 861–62 *infra* (this court ultimately disapproved efforts of the Debtors to transfer its assets to Heisley entities through a § 363(b) sale). In furtherance of the first option, Heisley, through HAC, began negotiations with the consortium of lenders holding the senior secured debt ("the Bank Group") in April, 1993.

and N/S did not consider the high offer as serious.

In March, 1993, Heisley and his employees began performing their "due diligence" inspection of N/S. In April, 1993, Heisley made a formal offer to purchase N/S. AA considered the Heisley offer superior to all of the others, and advised N/S to accept it. Negotiations between Heisley and N/S ensued.

However, before these negotiations could proceed very far, the Bank Group, concerned that the Debtors intended to pay a substantial retainer to a local bankruptcy firm, Adelman Lavine Gold & Levin ("Adelman"), seized N/S's bank accounts on April 27, 1993, and set off the funds contained therein against N/S's debt (this undertaking is referenced as "the Sweep"). Despite the efforts of N/S's management, and, apparently, Heisley himself, to convince the Bank Group to release the funds they had seized, the Bank Group refused, and N/S was forced to shut down. All branch stores owned by N/S ("the Company Stores")[2] were instructed to close the following day, and their employees were instructed not to report to work. N/S did not inform the Landlords of this development. Because N/S's food product distribution came to an abrupt halt, a group of franchisees ("the Franchisees"), in a desperate attempt to restart food distribution, filed an involuntary Chapter 7 bankruptcy against N/S on May 4, 1993.

At this juncture, we note that N/SF, a partnership, was itself a franchisee of N/S. Although N/S was a partner of N/SF, the managing partner of N/SF, NSF Management Inc. ("NSFM"), and specifically its principal, Philip Voluck, ran the day-to-day operations of N/SF in a manner which was largely independent from the operations of N/S. NSFM itself filed an involuntary Chapter 11 petition against N/SF on July 12, 1993, and relief was entered under the terms of a Stipulation of August 5, 1993. The N/SF case was thus initiated in the midst of the

developments recited below, and it merely followed in the track of the N/S case thereafter.

Returning to the pertinent chronology in the N/S case, we begin by noting that, at the outset of that case, on motion of the Franchisees, we conducted an expedited hearing on their motion to appoint an interim trustee. At the hearing, we learned of growing support among all interested parties for the installation of HAC to manage N/S instead of a trustee. Indeed, Heisley, who was still interested in acquiring the assets of N/S, opposed the appointment of a trustee.

By agreement of all interested parties, at the end of that hearing, we entered an Order of May 7, 1993 ("the May Order"), providing, *inter alia,* as follows:

1. An interim Trustee shall be appointed by the Office of the United States Trustee ... unless, prior to the time referenced in paragraph 2 *infra,* this Court and the Office of the United States Trustee shall have been advised, in writing, that Heico Acquisitions, Inc. has acquired effective control of [N/S], and the Shareholders have transferred such control.

2. This Order shall be effective at 12:00 Noon on May 7, 1993.

3. In the event that the notice referenced in paragraph 1 *supra* shall have been timely given, this Order shall be vacated.

Although we ultimately received notice from HAC that control of N/S had been acquired late in the day of May 7, 1994, the notice was provided after the 12:00 noon deadline. Therefore, under the terms of the May Order, an interim trustee, John T. Carroll, III, Esquire ("the Trustee"), was appointed.

At this point, the Franchisees, who had filed the motion seeking the appointment of a trustee in the first place, now filed an emergency motion to vacate the appointment of the Trustee. After a hearing at which it was established that HAC was now at the helm of

---

**2.** N/S's services and products were distributed through a network of branch stores either owned by N/S itself or individual franchisees ("the Franchisees"). The plaintiffs are all Landlords of the Company Stores. N/S owned approximately 283 Company Stores and N/SF owned approximately 70 Company Stores. Prior to the Bank Group's Sweep, 80 Company Stores had already been closed by either N/S or N/SF. Soon after the Sweep, the remaining Company Stores were closed.

N/S, and that all appearing interested parties (including the Bank Group and the former management and shareholders of N/S) except the Trustee desired his removal, we vacated the appointment of the Trustee on May 12, 1993.

In conjunction with the removal of the Trustee, the board of directors of N/S voluntarily resigned and were replaced by Heisley, as chairman of the board, and two of his colleagues. Heisley was also elected chief executive officer of N/S. Certain key employees of N/S, who had left the company after the Sweep, were brought back to run the day to day operations of the company. One of these key employees, N/S's house counsel, Joel Rosen, Esquire, suggested that N/S hire the law firm of Schnader, Harrison, Segal & Lewis ("Schnader") as bankruptcy counsel to replace Adelman. In order to entice Schnader to accept the offer of employment in the face of some concern that administrative claimants, including the Debtors' professionals, would not be paid, Heico, Inc., another Heisley entity which is not a defendant but is allegedly the parent of the Heico Defendants ("Heico"), guaranteed Schnader's fees in an agreement dated June, 1993. We approved the appointment of Schnader's fees as N/S's counsel on June 18, 1993.

Meanwhile, Heico continued its negotiations with the Bank Group regarding the purchase of N/S's assets. In early May, 1993, the parties created an unsigned term sheet ("the Term Sheet") outlining a proposed transaction in which Heico would purchase the assets of N/S from the Bank Group for $14 million. This transaction was premised on the Bank Group's securing relief from the automatic stay in order to foreclose on its collateral and then selling the collateral to Heico at an extrajudicial foreclosure sale. The Term Sheet also recited that the Bank Group would consent to the conversion of N/S's bankruptcy to Chapter 11 and to a cash collateral agreement involving the distribution and sale of food to the Franchisees. The Term Sheet, as it related to the sale of N/S's assets, was not, however, formalized until an agreement was executed by HAC and the Bank Group on August 30, 1993.

On May 24, 1993, N/S filed an answer to the involuntary petition filed by the Franchisees. On June 3, 1993, the Franchisees, with the consent of N/S, filed an amended involuntary petition contemplating a conversion of the case to a Chapter 11 case. We entered an Order for relief and simultaneously converted the case to Chapter 11 on June 4, 1993. Apparently the Franchisees were willing to accommodate the Debtors in this conversion of the case, because arrangements were being made, in conjunction with the conversion, to start food distribution. In fact, HFA had already begun to distribute food to the Franchisees apart from N/S's efforts.

On June 11, 1993, N/S filed an application seeking authority to use cash collateral pursuant to the arrangement of the Bank Group. After notice and an expedited hearing on June 16, 1993, we entered an interim order, later extended by subsequent interim Orders through November, 1993, approving the use of the Bank Group's cash collateral in order to restart N/S's food distribution and to allow N/S to begin reopening Company Stores.

It is noteworthy, in light of the Proceedings, to observe that, despite N/S's request for same, the Bank Group refused to permit the use of its cash collateral to pay rent to the Landlords, with the exception of two months of future rent payments for five newly reopened "test" stores. Nevertheless, with unencumbered cash, N/S began to reopen Company Stores which had previously been profitable. N/S was particularly desirous of reopening certain Company Stores located in the State of New York in order to avoid legal complications arising from that state's franchise laws. *See In re Nutri/System, Inc.*, 1993 WL 525668 (Bankr.E.D.Pa. Dec. 15, 1993) (this court ultimately abstains from deciding whether N/S forfeited a letter of credit posted under New York franchise laws in light of the fact that all the Company Stores were temporarily closed and only some were reopened).

Approximately seventy-five (75) Company Stores have been reopened as of the date of trial. When Company Stores were reopened, N/S agreed to pay their rent from that point forward. Thus, no delinquent, post-petition

rent for Company Stores accruing prior to their reopenings was paid to the Landlords. The Landlords of those Company Stores which were not reopened received no payments at all.

Throughout the course of the Debtors' bankruptcies, many Landlords filed motions for relief from the stay, to compel the assumption or rejection of leases, and/or for payments of administrative rents. N/S, faced with the 60–day deadline contained in 11 U.S.C. § 365(d)(4) by which it was obliged to assume nonresidential real estate leases or have them deemed rejected, filed a motion to reject certain of its leases on July 1, 1993. This motion, which we granted on July 28, 1993, concerned only those leases of the Company Stores which were previously closed by N/S pre-petition. *See* page 859 n. 2 *supra.*

N/S also filed a motion, on August 3, 1993, to extend the time in which it might assume such leases ("the N/S Lease Extension Motion"). Many Landlords filed objections and responses to the N/S Lease Extension Motion. By agreement of all interested parties, we entered an Order on September 14, 1993, which permitted N/S to reject the leases of every Landlord who had objected to the Lease Extension Motion and extended the time in which N/S could assume or reject the other leases to October 15, 1993.

N/SF filed a similar lease extension motion in its bankruptcy case on November 11, 1993 ("the N/SF Lease Extension Motion"). The hearing on the N/SF Lease Extension Motion was conducted on December 8, 1993. Without objection by any interested party, we granted N/SF an extension to January 15, 1994, to assume or reject its nonresidential real estate leases. Although we did not approve any lease rejections, we did invite any Landlord who wanted relief prior to January 15 to file an appropriate motion. Ultimately, N/S and N/SF each assumed but one lease.

Most of the premises associated with the rejected leases contained personal property of little value, *i.e.*, furniture, leased telephones and computers, and increasingly outdated food. Nonetheless, these properties needed to be emptied out, and their contents liquidated, in order for the Debtors to turn over the premises to the Landlords, as was presumably required in most if not all of the leases, in "broom clean" condition. N/S filed a motion on July 27, 1993, seeking permission to liquidate the personal property located at these various premises. The costs of this liquidation were to be paid from the proceeds of the sale of the personal property. We granted this motion, unopposed, in an Order dated August 4, 1993.

Thereupon, N/S hired Arthur Rea, its former senior director of business planning, to effectuate the liquidation of the personal property contained in the Company Stores and surrender their emptied premises to the Landlords. Rea began his duties in mid-August, 1993, and continued emptying out Company Stores, more or less continuously, through February, 1994. Most of the Company Stores were vacated by September 1, 1993.

In the meantime, the Bank Group, on July 21, 1993, filed a motion for relief from the automatic stay in the N/S case ("the Relief Motion"). The hearing on the Relief Motion was originally scheduled on August 18, 1993, although it was continued pending disposition of a motion, filed by N/S on September 9, 1994, requesting this court to approve bidding and other procedures in contemplation of a sale of virtually all of its assets to Heico, pursuant to 11 U.S.C. § 363(b) ("the Sale Motion"). The Sale Motion was scheduled for a hearing on September 15, 1993. When the Franchisees and the counsel for Creditors' Committee opposed the Sale Motion, principally because they were desirous of entertaining overtures from two other prospective purchasers of the Debtors' assets, the hearing on the Sale Motion, with the hearing on the Relief Motion, was continued to September 22, 1993, and then to October 6, 1993, to attempt to reach a consensus.

No consensus was reached as of October 6, 1993. The Franchisees, although their constituency was divided in its alliances, at this time favored the proposal of one of the other bidders, known as Regal Acquisition Co. ("Regal") to that of Heico. In light of this dispute, N/S withdrew the Sale Motion. The

Bank Group then pressed forward with a hearing on the Relief Motion.

At the close of that hearing, we entered an interim Order on October 7, 1993, in which we ordered the stay to remain in effect as to the Bank Group, but only until November 3, 1993, at which time this court would determine whether a viable plan of reorganization had been filed by any party in interest, such as Regal, on or before October 29, 1993. Regal did file a plan of reorganization and disclosure statement on October 29, 1993. However, on November 3, 1993, the Franchisees announced that they had decided to support the Heico offer rather than the Regal offer after all. Regal then withdrew its plan. In accordance with our Order of October 7, 1993, we then proceeded to enter an Order of November 4, 1993, granting the Bank Group relief from the automatic stay.

On November 24, 1993, N/S filed another motion pursuant to 11 U.S.C. § 363(b) to establish bidding and other procedures to sell its assets to Heico ("the Second Sale Motion"). On December 1, 1993, NSI and the Bank Group entered a final agreement pursuant to which the Bank Group agreed to sell its senior secured claim to NSI for $14 million prior to adjustments. Nevertheless, after a hearing of December 9, 1993, this court denied the Second Sale Motion, concluding, despite the Franchisees' support, but in light of the opposition of the United States Trustee to the use of § 363(b) in such a fashion, that the § 363(b) procedure was inappropriate, since the Debtors admittedly did not intend to reorganize. We then scheduled a status hearing of December 15, 1993, to learn what the Debtors intended to do with their cases as a result of this ruling.

We were informed, on December 15, 1993, that the Debtors intended to allow the Bank Group to foreclose on their assets and transfer them to Heico pursuant to these parties' agreements, and to immediately thereafter file motions to voluntarily dismiss their bankruptcy cases. NSI in fact filed on that date, December 15, 1993, an expedited motion to dismiss the N/SF case or, alternatively, for relief from the automatic stay in order that it could foreclose on that portion of its collateral comprising N/SF's assets. A hearing on that motion was scheduled on December 23, 1993. Apparently spurred into action by the prospect that these cases would disappear from our docket, the Landlords then filed the Proceedings before us on December 22, 1993.

At a hearing of December 23, 1993, on this motion, upon the Landlords' opposition to dismissal of the N/SF case, relief from the stay was granted to NSI only. NSI thereafter actually acquired the assets of both Debtors when it credit-bid its recently-acquired secured position of the Bank Group at an extrajudicial foreclosure sale conducted on December 28, 1993. The next day the assets were transferred to NSILP. NSILP changed its name to Nutri/System L.P. and is now the operating entity of the businesses formerly owned by N/S and N/SF. After these transactions, N/S and N/SF were left as empty corporate shells.

N/S proceeded to file its anticipated motion to dismiss its bankruptcy case on January 20, 1994. The next day, N/SF refiled a motion seeking to dismiss its case (both the N/S motion and the refiled N/SF motion are referred to as "the Motions to Dismiss"). After hearings on the Motions to Dismiss on February 22, 1994, at which only the Landlords again appeared to oppose same, we entered an Order in which we explained that it was only due to the presence of the Proceedings that the cases would not be dismissed and that the Cases would be dismissed immediately upon the settlement, dismissal, or other disposition of the Proceedings. The Motions to Dismiss were then carried over to April 13, 1994, the scheduled date of the trial of the Proceedings.

As noted above, we have previously been presented with two substantive pretrial motions filed in the Proceedings, which we decided in *Nutri/System I* and *Nutri/System II,* respectively. On April 7, 1994, we granted the Landlords' Motions for class certifications in both Proceedings. Due to our need to decide these preliminary matters, and upon advice from the parties that additional time for completion of discovery was necessary, we ultimately continued the trial of the Proceedings to May 26, 1994.

The trial on the merits of the Proceedings spanned three days, May 26, 27 and 31, 1994. By our post-trial Order dated June 1, 1994, we invited the parties to file post-trial briefs and proposed findings of fact and conclusions of law on or before June 10, 1994 (the Landlords), and June 20, 1994 (the Defendants). All parties filed their submissions in accordance with that Order and, in light of our consideration of two substantial pre-trial dispositive motions, we are well prepared to render a final decision.

## C. DISCUSSION

1. THE FACTS, AND THE INFERENCES TO BE DRAWN THEREFROM, DO NOT SUPPORT THE LANDLORDS' THEORY THAT HEISLEY AND THE HEICO DEFENDANTS SCHEMED TO BENEFIT THEMSELVES AT THE EXPENSE OF THE LANDLORDS.

■ With a display of creativity and intuition, the Landlords seek to turn a sow's ear into a silk purse. However, after the Complaints are stripped of their rhetoric by the rather unremarkable facts proven at trial, which rebut the Landlords' suggestions of conspiracy and other allegations in the Complaints sufficient to prevent a disposition against them prior to trial, the Landlords' case is simply this: (1) Heisley, through entities he controls, took control of the Debtors with the intent to operate them in bankruptcy until such time as he could purchase their assets;[3] and (2) along the way, the Landlords were harmed by not being paid their administrative rent. While these naked statements are true, the facts elicited at trial do not support the conclusion that Heisley or the Heico Defendants, in the process of carrying out the former, are now liable for the latter.

Although Heisley's self-interest may, at first glance, give pause to one not familiar with the Debtors' cases, it must be remembered that this very self-interest, which was fully disclosed at all times during the bankruptcies, is what made his involvement in the management of the Debtors so attractive to the Franchisees, the Bank Group, and the other creditor entities, including, after a change in counsel, the Creditors' Committee, as well as the Debtors' original directors, officers, and shareholders, and almost every other interested party who took an active role in these bankruptcy cases.

Because Heisley was interested in preserving the Debtors, their operations, and their assets for eventual purchase, he was the only party willing to actually invest in the Debtors during the critical, early portion of the Debtors' bankruptcies.[4] The parties in interest, realizing that Heisley's involvement in the bankruptcy cases would incidentally inure to their benefit, rallied around him and urged this court to allow him to manage the Debt-

---

3. As the Defendants note in their post-trial brief, the Landlords do not name Heisley as a defendant, and lump both the Debtors and the Heico Defendants together as if there was only one defendant—and one bankruptcy case. The Defendants assert that the Landlords' failure to differentiate between the Heico Defendants and the two bankruptcy cases, *inter alia,* prevents us from granting them relief. This argument is not without merit. For example, it is not clear that the facts supporting the Landlords' theory regarding the Heico Defendants' alleged control of N/S apply as well to the N/SF case. Furthermore, clearly not all of the Heico Defendants engaged in the activities which the Landlords claim amounted to domination of the Debtors, nor do they all have claims which may be subordinated, assets which may be reached, or collateral which may be surcharged. Thus, if we recognize the individuality of each Heico Defendant, it is clear that all of the them could not be liable on every Count of both Complaints. On the other hand, the Landlords argue that Heisley controlled all of the Defendants. Therefore, they argue, by implication, that the actions of any one can be imputed to the group as a collapsed single entity. Because we enter judgment in favor of the Defendants on all three Counts, we need not attempt to wade through this quagmire. For stylistic ease, and not intending to connote anything substantive, we have adopted the convention of referring to the Debtors and the Defendants in the same manner as the Landlords, *i.e.,* as if they were one entity, unless specific reference to an individual is required.

4. As noted above, HFA began purchasing and distributing food to the Franchisees at its own expense well before Debtors were in a position to do so. Furthermore, HFA provided N/S with debtor-in-possession financing in return for a lien subordinate to the lien of the Bank Group— surely a valueless position in light of the size of the senior secured debt.

ors at the commencement of the Case, as opposed to the Trustee. Thus, this is not a case of an existing insider who, dressed in the lamb's clothing of selfless motivation for the benefit of the firm, seeks, in actuality, to steal corporate opportunities or engage in self-dealing. Rather, we have an interested suitor (a white knight, if you will) agreeing to operate the Debtors post-petition in an attempt to preserve, and possibly enhance, the value of their assets. Although it is beyond dispute that Heisley stood to benefit from such efforts, so too did the many interested parties who actively sought his involvement. It would be unjust to allow Heisley to join the process and invest funds in the Debtors, and then punish him for his self-interest—a self-interest which was the very condition of his involvement, disclosed from the onset and known to all parties.[5]

Reviewed *in toto*, Heisley's and the Heico Defendants' management of the Debtors has been aboveboard and consistent with the Bankruptcy Code. All corporate formalities have been maintained. There is no evidence that the Debtors have not complied with the administrative requirements of the Bankruptcy Code. Nor is their any evidence that the Debtors, the Heico Defendants, or Heisley himself have surreptitiously taken any action which would have otherwise required bankruptcy court review and approval after notice and a hearing. Every step of the way, the Debtors, the Heico Defendants and, for that matter, all other parties implicated by the Landlords' allegations, have sought and secured court approval before taking almost every action involving the Debtors, the Landlords' leases, or the senior secured claims. And, at each one of these junctures, it has always been made clear to this court what interest, if any, Heisley had in the proposed action or the events to follow the proposed action.

After scrutinizing those aspects of the bankruptcies which impacted upon the Landlords, their leases, and their administrative rent claims, we likewise find nothing sinister.

Although the Debtors possibly could have addressed their lease situations more quickly than they did, there is no evidence that the Landlords and their leases were tied up intentionally so that the Debtors or the Heico Defendants could derive some benefit at the Landlords' expense. There was no evidence presented which would suggest that the maintenance of the Company Stores was critical to the N/S distribution network or improved the Debtors' going concern value, except perhaps in the State of New York. *See* page 860 *supra.* Indeed, the Bank Group and Heisley thought that the Company Stores were, for the most part, a liability to the value of the Debtors' assets. Nor were the contents of these Company Stores of great value to any party. We are impressed by the testimony of Rea that he vacated the Company Stores as quickly as possible given the difficult logistics of the task and the limited funds available to complete it. We would generally describe the Debtors' actions vis-a-vis the Landlords by stating only that the complexity of the bankruptcies, the lack of surplus capital, and the large number and wide geographic distribution of the Company Stores resulted in a slower rate of vacancy than the Landlords, quite understandably, would have liked.

Finally, with regard to the reopening of the Company Stores, the Lease Extension Motions, and the liquidation of the personal property located at the Company Stores, we heard uncontroverted testimony that neither Heisley nor his entities were involved in these decisions. Rather, these decisions were apparently made by N/S's president, Mark A. Miller, a former vice president and longtime employee of N/S who was hired back by Heisley (or possibly the Trustee before him) to manage the day-to-day operations of N/S. Although Heisley, as CEO and chairman of the board, had the last word on all corporate decisions, the origin of these particular decisions suggests that they were made as a part of the ordinary corporate

---

5. Although the Landlords indicate that they were not all notified of various pivotal developments in the bankruptcy cases, they do not argue that any movant or petitioner failed to properly serve its papers on all parties required by the F.R.B.P.

If the Landlords believe that proper service under the F.R.B.P. rules is insufficient, they must address their complaints to the promulgators of these rules, not this court.

management process, and not as a part of a scheme masterminded by Heisley and carried out by the Debtors, acting in the capacity of straw men. As we noted in *Nutri/System I, supra*, slip op. at *4, it is an unfortunate reality of bankruptcy that claims of lower priority are sometimes not paid. Similarly, the occurrence of bankruptcy with its automatic stay often has financial repercussions for creditors to which there is no adequate recompense. *Cf. United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 371–73, 108 S.Ct. 626, 630–31, 98 L.Ed.2d 740 (1988) (undersecured creditor was not entitled to interest to compensate for the delay of its foreclosure rights caused by the automatic stay). The Landlords cannot, however, seek to rectify this situation by resort to the resources of the Heico Defendants which is not justified by the Code. *Accord In re Sports Information Data Base, Inc.*, 64 B.R. 824, 828 (Bankr.S.D.N.Y.1986) ("In the unfortunate event that the estate lacks unencumbered funds to pay the landlord's administrative rent claim, it does not follow that the secured creditor bears the expense.").

2. **THE LANDLORDS ARE NOT ENTITLED TO RELIEF PURSUANT TO 11 U.S.C. § 510(c).**

 Counts I of the Complaints seek the equitable subordination the secured claim of NSI to the administrative claims of the Plaintiffs pursuant to 11 U.S.C. § 510(c), which provides, in pertinent part, that "the court may ... under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim...." In order to successfully subordinate a claim of higher priority, the movant must establish the following elements:

(i) The claimant ... engaged in some type of inequitable conduct....

(ii) The misconduct ... resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant....

(iii) Equitable subordination of the claim ... [is] not ... inconsistent with the provisions of the Bankruptcy Act.

*In re Comtec Industries, Inc.*, 91 B.R. 344, 347 (Bankr.E.D.Pa.1988) (citations omitted). *Accord, In re Mobile Steel Co.*, 563 F.2d 692, 702 (5th Cir.1977); *In re 641 Associates, Ltd.*, 140 B.R. 619, 627 (Bankr.E.D.Pa.1992); and *In re Beck–Rumbaugh Associates, Inc.*, 103 B.R. 628, 635 (Bankr.E.D.Pa.1989), *aff'd*, 114 B.R. 418 (E.D.Pa.1990).[6] Equitable subordination is an extraordinary measure which is not lightly invoked. *Accord, Claxton, supra*, 76 B.R. at 546 ("Like other forms of equitable relief, equitable subordination in bankruptcy is not to be invoked lightly."); *In re Tinsley & Groom*, 49 B.R. 85, 90 (Bankr.W.D.Ky.1984) ("[E]quitable subordination is a harsh remedy that is not to be lightly invoked."); *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 499 (Bankr.S.D.Ohio 1982) ("Subordination is essentially a discretionary exercise of the court's equitable powers, and should only be used sparingly to rectify obvious inequities.").

 It is well established that the party invoking subordination must show, with particularity, egregious conduct on the part of the respondent to effect subordination unless the respondent is an insider, in which case the burden on the moving party is less demanding. *See In re N & D Properties, Inc.*,

---

**6.** The *Mobile Steel* court, which first articulated the three part equitable subordination test, also stated three principles to be considered in conjunction therewith:

a) Inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim.

b) A claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct.

c) The burden of proving all the elements of subordination is on the objectant.... [T]he objectant must prove by a preponderance of the evidence that the claimant engaged in such substantial inequitable conduct to the detriment of the debtor's other creditors that subordination is warranted.

563 F.2d at 700–01. *Accord, In re Pacific Express, Inc.*, 69 B.R. 112, 116 (9th Cir. BAP 1986); and *In re Claxton*, 76 B.R. 539, 542 (Bankr. E.D.Va.1987).

799 F.2d 726, 731 (11th Cir.1986); *Pacific Express, supra,* 69 B.R. at 116; and *In re Teltronics Services, Inc.,* 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983). When the defendant is an insider, the court's scrutiny of the challenged actions of the defendant is more exacting. *See In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1282 n. 13 (8th Cir.1988); *In re Osborne,* 42 B.R. 988, 996 (W.D.Wis.1984); *In re Beverages International Ltd.,* 50 B.R. 273, 280 (Bankr.D.Ma.1985); and *Teltronics, supra,* 29 B.R. at 169. In such a case, the moving party must introduce evidence that the respondent breached its fiduciary duties or engaged in unfair conduct, at which point the burden will shift to the respondent to prove the good faith and fairness of its actions. *In re Fabricators, Inc.,* 926 F.2d 1458, 1465 (5th Cir.1991); *Bellanca Aircraft, supra,* 850 F.2d at 1282 n. 13; *N & D Properties, supra,* 799 F.2d at 731; and *Osborne, supra,* 42 B.R. at 996. On the other hand, insider status alone is not sufficient grounds to warrant subordination. *See, e.g., Beverages International, supra,* 50 B.R. at 281. *Accord,* 3 COLLIER ON BANKRUPTCY, ¶ 510.05[3][a], at 510–12 to 510–15 (15th ed. 1993).

▪ The Defendants argue that the Heico Defendants, and specifically NSI, were not insiders of the Debtors. Because Heisley became the chairman of the board and chief executive officer of N/S shortly after the involuntary petition was filed, and because the Landlords' administrative rent claims began to accrue shortly prior thereto, it is clear that Heisley, at least, *was* an insider during much of the time when the alleged inequitable conduct occurred. Thus, we will assume, for the purposes of our discussion, that we can collapse the Defendants and Heisley into a single entity which is, indeed, an insider of both Debtors. *But see* page 863 n. 3 *supra.* Notwithstanding this assumption, and the stricter scrutiny which accompanies it, we conclude that the Defendants have not treated the Landlords unfairly, and we will therefore not subordinate the claims of the Heico

Defendants to the administrative rent claims of the Landlords.

▪ Courts have identified three general categories of inequitable conduct which warrant the equitable subordination of a creditor's claim: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) a creditor's use of debtor as an alter ego or instrumentality. *See Fabricators, supra,* 926 F.2d at 1467; *In re Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206, 212 (5th Cir.1983); and *Beverages International, supra,* 50 B.R. at 281. Although these forms of inequity certainly could be perpetrated post-petition, in the course of a bankruptcy case, our research has not located one case in which the post-petition conduct of a claimant was challenged under section 510(c).[7] As we noted previously, *see Nutri/System I, supra,* slip op. at *6, the self-interests of the various parties which come to focus in a bankruptcy case, coupled with the watchful eye of the court and the controls contained in the Bankruptcy Code, make bankruptcy a very infertile ground upon which to cultivate schemes. On the other hand, we do not mean to suggest that our duty to carefully scrutinize the actions of an insider is lessened post-petition. Fraud of trustees or debtor's counsel, for example, does occur, and such occurrences serve as a nagging reminder that anything is possible. However, no such fraud or other grossly improper conduct on the part of the Defendants is established here.

In Counts I of the Complaints, the Landlords assert that the Defendants gained control of the Debtors so that they might carry out a "scheme or plan" to acquire the Debtors' "assets, property and business while avoiding the payment of administrative claims...." There is no question that Heisley became involved in the Debtors' businesses with the ultimate goal of acquiring their assets. *But see In re ASI Reactivation, Inc.,* 934 F.2d 1315, 1321 (4th Cir.1991) (there is nothing in the Code which prohibits an insider from acquiring rights as a lien creditor,

---

7. On the other hand, we do not agree with the Defendants when they suggest that equitable subordination is applicable to pre-petition conduct only. There is nothing in the language of § 510(c) which would so limit our inquiry, nor will we engraft limitations into the statute which Congress opted not to include.

especially when he does so to "stave off foreclosure, for the company's benefit, as well as to solidify his position."); and *Pacific Express, supra,* 69 B.R. at 117–18 (it was not equitable for creditors to seek an equity "sweetener" from the debtor in light of the risk associated with the underlying loan and the knowledge and consent of the debtor's largest unsecured creditor). Similarly, there is no question that Heisley perceived bankruptcy as a viable venue in which to carry out these acquisitions.

From the very start of Heisley's negotiations with N/S, the parties have always considered a § 363(b) sale as a possible mechanism for accomplishing an asset sale—even before N/S was actually forced into bankruptcy by the Sweep and the Franchisees' involuntary petition. However, there was no evidence whatsoever that Heisley preferred a sale in bankruptcy because he knew he could (or, at least, hoped to) utilize the stay in order to acquire the services of the Debtors' administrative claimants, like the Landlords, free of charge. Rather, it appears far more likely that Heisley's sole motivation for preferring a bankruptcy setting was the apparent availability of the § 363(b) sale mechanism. It should be recalled that N/S did indeed file a motion to sell its assets free and clear of all liens pursuant to 11 U.S.C. § 363(b).

However, this court, at the bidding of the United States Trustee, concluded that it was inappropriate to allow the sale of substantially all of N/S's assets when no plan, even in a liquidation mode, was contemplated. It was for this reason only that N/S was forced to withdraw the Second Sale Motion. The presence of a premeditated scheme to bilk the Landlords is therefore not supported by the evidence.

We must now look at the isolated events complained of by the Landlords to see if they, standing alone and independent from any larger scheme, constituted inequitable conduct. We do not doubt that the Landlords were harmed as a result of the accrual of post-petition rent which has not, and in all likelihood will not, be paid by the Debtors. Most of this rent accrued during the 60–day period given to all debtors by 11 U.S.C. § 365(d)(4) to decide whether to assume or reject their nonresidential real estate leases. Section 365(d)(4) provides that:

> [I]n a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential lease property to the lessor.

Some portion of the Landlords' rent claims accrued after the initial 60 days as a result of our Order granting the Debtors' Lease Extension Motions. The final portion of the administrative rent claims accrued after individual leases were rejected or deemed rejected and before the properties were actually surrendered to the Landlords.

The Landlords assert that the Defendants violated § 365(d)(3) by failing to make current rent payments to all Landlords until such time as their leases were assumed or rejected, *see* 11 U.S.C. § 365(d)(3) ("The trustee shall timely perform all obligations of the debtor, ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected...."). They also contend that the Defendants violated § 365(d)(4) by failing to turn over the leased premises immediately upon rejection. We are satisfied, however, that the Debtors, per Rea, made every reasonable effort under the circumstances to visit, empty, and surrender the many Company stores located throughout the United States to the Landlords as soon as practicable. Although § 365(d)(4) requires the surrender to occur "immediately," this standard must be tempered by what is feasible. *See In re Morningstar Enterprises, Inc.,* 128 B.R. 102, 105–06 (Bankr. E.D.Pa.1991) (a rejection of a lease by effect of § 365(d)(4) merely entitles a landlord to relief from the automatic stay, not summary eviction of the debtor). Even if we applied the standard absolutely, the Debtors' failure to meet it notwithstanding their best efforts would not rise to the level of inequity.

Likewise, the Debtors' failure to pay administrative rent on a current basis was not the result of a devious plot to injure the Landlords, but rather the unfortunate offspring of impossibility. *See Claxton, supra,* 76 B.R. at 546 ("It is regrettable that without subordination there will be no funds in the estate with which to satisfy unsecured creditors and the administrative claims of the trustee and trustee's counsel for their diligent services in this protracted and difficult case. Nevertheless, it is not the responsibility of the secured creditors to pay the administrative expenses of the estate."). *See also In re Orient River Investments, Inc.,* 112 B.R. 126, 134 (Bankr.E.D.Pa.1990) ("[A] landlord will not be allowed immediate payment of rentals due under a lease in effect during the period between the bankruptcy filing and rejection or assumption of a lease unless it establishes that there is a likelihood that the debtor will pay all administrative claims in full.").

 If the Landlords could have shown that these alleged Code violations were intentional, our conclusion might have been different. Generally, however, we think innocent and unavoidable violations of certain strictures of the Bankruptcy Code will not *per se* constitute unjust conduct warranting the subordination of a secured creditor's claim. *See In re Mace Electronics of Ohio, Inc.,* 92 B.R. 753, 757 (Bankr.N.D.Ohio 1988) ("Debtors' failure to pay Plaintiffs' administrative rent claims preconversion ... is [not] tantamount to inequitable conduct [nor does it] give[ ] rise to other prerequisites which would warrant an equitable subordination."). *Cf. Bellanca Aircraft, supra,* 850 F.2d at 1282 (receipt of a preference in violation of 11 U.S.C. § 547, "without more," is not the type of inequitable conduct that warrants the subordination of the recipient's claim).

Furthermore, the Defendants made no false or misleading statements to the Landlords suggesting that their administrative rents would be paid. Indeed, they did not attempt to discourage the Landlords from seeking relief from the automatic stay to exercise their rights, nor did they oppose those who did. As the Landlords themselves point out, at no time during these bankruptcy

cases did the value of the Debtors' assets exceed the amount of the senior secured debt. Thus, when the Bank Group refused to permit the Debtors the use of its cash collateral to pay administrative rent, the writing was on the wall. *See Mace Electronics, supra,* 92 B.R. at 755–57 (nothing in the cash collateral order should have misled the landlords into thinking that their administrative rent claims would be paid; thus, subordination of the creditor's claim is not appropriate). *Cf. In re Groves Farms, Inc.,* 64 B.R. 276, 278 (Bankr.S.D.Ind.1986) (secured creditor notified all parties that only a certain portion of the proceeds from the sale of crops would be made available to pay for the costs of harvest; therefore, the court would not subordinate secured creditor's claim to that of a harvester who did not object to the arrangement until after it became clear that the harvester would not be paid in full). We find no evidence of any misrepresentations made by the Defendants which induced the Landlords to continue making the leased premises available to the Debtors. *Compare Fabricators, supra,* 926 F.2d at 1467; and *Osborne, supra,* 42 B.R. at 999–1000 (in both cases, the courts concluded that the defendants made affirmative misrepresentations with the intent to induce trade creditors to extend credit to financially-strapped debtors, and for that reason, subordinated the defendants' claims).

Because the Landlords have failed to establish inequitable conduct on the part of the Defendants, we need not consider the other elements of § 510(c) before dismissing Counts I of the Complaints.

3. THE LANDLORDS HAVE NOT SHOWN THAT WE SHOULD PIERCE THE CORPORATE VEIL OF THE DEBTORS IN ORDER TO ALLOW THE LANDLORDS TO RECOVER THEIR CLAIMS FROM THE HEICO DEFENDANTS UNDER AN ALTER EGO THEORY.

 In Counts II of the Complaints, the Landlords seek to pierce the corporate veil of N/S in order to recover their administrative rent claims from the Heico Defendants. The Landlords assert that the Debt-

ors were nothing more than alter egos or instrumentalities of the Heico Defendants.[8]

It is clear that Pennsylvania will permit recovery on an alter ego theory by a showing of injustice once it is established that the dominant shareholder or the controlling corporation wholly ignored the separate status of a corporation and so dominated and controlled its affairs that its separate existence was a mere sham.

*Wheeling–Pittsburgh Steel Corp. ,v. Intersteel, Inc.*, 758 F.Supp. 1054, 1057 (W.D.Pa. 1990). *See also Zubik v. Zubik*, 384 F.2d 267, 270 n. 2 (3d Cir.1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968) ("[The movants] have 'the burden of establishing, by a preponderance of the evidence, that the corporation was an artifice and a sham designed to execute illegitimate purposes in abuse of the corporate fiction and the immunity it carries....'" quoting *Coryell v. Phipps*, 128 F.2d 702, 704 (5th Cir.1942), *aff'd on other grounds*, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943)). Generally, courts will recognize and affirm separate corporate existences "unless specific, unusual circumstances call for an exception." *Zubik, supra*, 384 F.2d at 273. *See In re Penn Central Securities Litigation*, 335 F.Supp. 1026, 1035 (E.D.Pa.1971) (courts will only utilize their authority to disregard a corporate entity under "exceptional circumstances"); *Reverse Vending Associates v. Tomra Systems US, Inc.*, 655 F.Supp. 1122, 1128 (E.D.Pa.1987); and *In re Duo Metal & Iron Works, Inc.*, 45 B.R. 139, 143 n. 4 (Bankr.E.D.Pa.1984).

■ Before this court will disregard the Debtors' separate existences,

(1) [the Landlords] must establish that [the Heico Defendants] so controlled [the Debtors] as to make [the Debtors] a mere instrumentality or conduit of [the Heico Defendants] and (2) [the Landlords] must show that fraud, illegality, injustice or defeat of public policy will result if the court

does not pierce the corporate veil of [the Debtors].

*Penn Central Securities, supra*, 335 F.Supp. at 1035. *Accord, Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149 (3d Cir.1988) (after holding that New Jersey applies a similar test, the Third Circuit notes that "New Jersey is thus in line with the approach taken generally on this issue."). *See also Ashley v. Ashley*, 482 Pa. 228, 237, 393 A.2d 637, 641 (1978) ("[The] legal fiction of a separate corporate entity ... will be disregarded whenever justice or public policy demand and when the rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless."). *Cf. In re Streamlight, Inc.*, 108 B.R. 505, 508–09 (Bankr.E.D.Pa.1989) (this court recognizes similar standard for piercing the corporate veil under New York law).

■ The Heico Defendants' control over the Debtors must have been proven to have gone beyond majority or complete stock control, *see Craig, supra*, 843 F.2d at 150, or interlocking boards and officers, in order to establish their liability under an alter ego theory. *See Penn Central Securities, supra*, 335 F.Supp. at 1035. Rather, the control wielded by the Heico Defendants must amount to "'complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the [Debtors] as to this transaction had at the time no separate mind, will or existence of [their] own.'" *Craig, supra*, 843 F.2d at 150, quoting 1 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, § 43, at 490 (rev. perm. ed. 1983). *See also Penn Central Securities, supra*, 335 F.Supp. at 1035 (citing an earlier edition of same treatise); and *Krivo Industrial Supply Co. v. Nat'l Distillers and Chemical Corp.*, 483 F.2d 1098, 1106 (5th Cir.1973) ("In summary, then, the control required for liability under the 'instrumentality' rule amounts to total domination of the subservient corporation, *to the extent that the subservient corpo-*

---

8. The Landlords make a distinction between the alter ego theory and the instrumentality rule. This distinction has become blurred in the case law, to the extent it was ever maintained at all. Generally, these terms are used interchangeably to describe the courts equitable power to disregard the corporate existence of an apparent actor in order to impose liability on the person or entity who is in control of the disregarded corporation and who is actually responsible for the challenged actions.

*ration manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.")* (emphasis added).

▌ Courts look for the following indications of a company's lack of substance when considering whether to pierce the corporate veil of that company:

(1) gross undercapitalization;

(2) failure to observe corporate formalities;

(3) non-payment of dividends;

(4) insolvency of debtor corporation;

(5) siphoning of funds of corporation by dominant stockholder;

(6) non-functioning of other directors and officers;

(7) absence of corporate records;

(8) fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981). *See also Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279, 284 (3d Cir.1983); *Craig, supra,* 843 F.2d at 150; *Galgay v. Gangloff,* 677 F.Supp. 295, 299 (M.D.Pa.1987); and *Wheeling–Pittsburgh Steel, supra,* 758 F.Supp. at 1059. "Such circumstances justify piercing the corporate veil because the limited liability inherent in the corporation's separate existence is misused as a means or intermediary for the perpetration of fraud, illegality or injustice." *Reverse Vending, supra,* 655 F.Supp. at 1128.[9] Many of these factors do not apply with the same force, or at all, when the controlled corporation is already in bankruptcy.

▌ We conclude that neither the Heico Defendants nor Heisley himself controlled the Debtors in a way which would require us to disregard the Debtors' separate existenc-

es. Although there is no question that Heisley, with court approval, gained control of the Debtors in an ordinary corporate governance sense, he did not utilize the Debtors as his mere appendages in aid of accomplishing illicit or underhanded designs. At all times, the Debtors were properly operating in Chapter 11 while answering to their many creditors, who were often not the least bit concerned with Heisley or his companies. Although the Debtors were insolvent, undercapitalized, and not paying dividends to their shareholders, this can be said of many bankrupt debtors. In any event, the Heico Defendants had nothing to do with the Debtors' bleak financial picture, which was cast long before their arrival on the scene. *See Nutri/System I, supra,* slip op. at *9 n. 2.

▌ We have been presented with no evidence that corporate formalities were dispensed with once Heisley took control of the Debtors. Certainly, the Bankruptcy Code's administrative requirements were met. The Landlords have introduced no evidence that the Heico Defendants were siphoning off funds of the Debtors, nor did they rebut the Debtors' testimony that Heisley actually invested in the Debtors post-petition. Nor are we convinced that the Debtors' other directors and officers were puppets while Heisley called all the shots. Indeed, as we noted at page 864 *supra,* it was the officers and long time employees of N/S who ran the day to day operations of the Debtors and made many of the decisions of which the Landlords now complain. There was no evidence presented that the Debtors' corporate records were missing or incomplete. Finally, it is quite clear that the Debtors are not "mere facades," but rather, an international chain of weight loss centers which fell upon hard times. Based on the evidence, we cannot say that the Debtors "manifest[ed] no separate corporate interests of [their] own and func-

---

9. As we noted in *Nutri/System I,* slip op. at *9 n. 3, it is an open question in Pennsylvania whether the Landlords must prove that the Heico Defendants utilized their alleged control over the Debtors to perpetrate a fraud, or merely an injustice. *See Culbreth v. Amosa (Pty) Ltd.,* 898 F.2d 13, 14 (3d Cir.1990). Certain federal courts in this district have assumed that a showing of injustice is sufficient, *see, e.g., Reverse Vending, supra,* 655 F.Supp. at 1128; and *James E. McFadden, Inc. v.*

*Baltimore Contractors, Inc.,* 609 F.Supp. 1102, 1107 (E.D.Pa.1985), although at least one court has stated that this injustice must be "akin to fraud." *Reverse Vending, supra,* 655 F.Supp. at 1128. Today we need not attempt to determine how the Supreme Court of Pennsylvania would decide the issue because, even if the Landlords need only prove that the Heico Defendants used the Debtors to perpetrate an injustice akin to fraud, they have failed to meet their burden.

tion[ed] solely to achieve the purposes of the [Heico Defendants]." *Krivo, supra,* 483 F.2d at 1106.

Even if the Heico Defendants totally dominated the Debtors, we find no evidence that they did so to perpetrate fraud or injustice. Most of the Landlords' evidence attempted to show how the Heico Defendants took certain actions in order to gain control of the Debtors and acquire the Bank Group's senior secured position. As we noted several times before, however, this design was fully disclosed to and supported most of the parties who took an active role in the bankruptcy cases. *Cf. In re Rosecrest Enterprises, Inc.,* 80 B.R. 354, 357 (Bankr.W.D.Pa.1987) ("Debtor knowingly dealt with Highland in its corporate capacity, fully realizing that Highland was formed solely for the asset purchase.... [and] Debtor cannot now assert the propriety of Highland's dealings with third parties as a reason for piercing the corporate veil."). All of the crucial developments in the Debtors' cases described at pages 861–63 *supra* occurred over a period of several months. This court cannot recall any of the Debtors' many landlords which took any active role or expressed any dissatisfaction with the very public agreement of the Bank Group to sell the assets of the Debtors to Heisley.

Nor was the outcome of Heisley's acquisition of the Debtors' assets a foregone conclusion at any time prior to November 3, 1993. Regal appeared at numerous hearings and vigorously and, for a time, successfully wooed the support of many of the Franchisees, whose preferences of an ultimate purchaser were significant to the outcome of the disposition of the Debtors' assets. Heisley did, of course, outlast Regal and was able to consummate the deal which he hoped he had made with the Bank Group. But this result was, prior to November 3, 1993, far from inevitable.

Indeed, it is not the acquisition of the Bank Group's claim by Heisley to which the Landlords object; rather, it is the Debtors' alleged violations of 11 U.S.C. §§ 365(d)(3) and (4). Nevertheless, we find no evidence that the Heico Defendants engineered an elaborate scheme to gain control of the Debt-

ors and the senior secured debt with the ultimate goal of depriving the Landlords of their administrative rent. Thus, even if we impute all actions taken during the bankruptcies to the Heico Defendants, and this is impossible to do in light of the configuration of points of view of the various players in the case, the purpose of their involvement was legitimate, and the fact that the Debtors may have technically violated certain sections of the Bankruptcy Code in the process does not taint the entire enterprise.

■ Finally, much like our analysis in our discussion of equitable subordination, *see* pages 867–68 *supra,* we do not believe that, in most cases, including this one, committing violations of §§ 365(d)(3) and (4) are injustices which, standing alone, would warrant piercing a debtor's corporate veil. *Cf. Streamlight, supra,* 108 B.R. at 509 (issuing a potentially misleading press release and violating the Bulk Transfer Law were not wrongs which would warrant piercing the corporate veil).

Because the Landlords have not proven that the Heico Defendants dominated the Debtors to the point where the Debtors had no independent corporate existence of their own, nor that they were utilizing the Defendants to perpetrate a fraud or injustice, we will dismiss Counts II of the Complaints.

4. THE LANDLORDS HAVE NOT MET THEIR BURDEN OF PROOF REGARDING THE EXTENT, NECESSITY, AND BENEFIT OF THEIR POST–PETITION SERVICES AND EXPENDITURES TO THE DEFENDANTS, NOR HAVE THEY ESTABLISHED THAT THE DEFENDANTS CONSENTED TO PAYMENT OF ANY OF THEIR CLAIMS; THEREFORE, THEY ARE NOT ENTITLED TO SURCHARGE THE HEICO DEFENDANTS' COLLATERAL PURSUANT TO 11 U.S.C. § 506(c).

■ In Counts III of the Complaints, the Landlords seek to surcharge the Heico Defendants' collateral pursuant to 11 U.S.C.

§ 506(c) which states: "The trustee [10] may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

■ This court has devised two alternative tests for determining whether a secured creditor is obliged to reimburse the costs of movant's acts of preserving or disposing of the secured creditor's collateral under § 506(c). *In re Orfa Corp. of Philadelphia*, 149 B.R. 790, 799 (Bankr.E.D.Pa.1993) ("*Orfa I*"), *vacated on other grounds*, 1994 WL 163666 (E.D.Pa. April 26, 1994) ("*Orfa II*"); and *In re Cann & Saul Steel Co.*, 86 B.R. 413, 418 (Bankr.E.D.Pa.1988). The first test, which tracks the language of § 506(c), is known as the objective test. The objective test seeks to determine if the secured creditor has benefitted by the movant's efforts, and if so, the value of that benefit to the secured creditor. *See Orfa II, supra*, slip op. at *13; *Orfa I, supra*, 149 B.R. at 798–99; and *Cann & Saul, supra*, 86 B.R. at 418. In order to satisfy the objective test, the movant must show that (1) its expenditures or services were necessary, (2) the amounts expended or services rendered were reasonable, and (3) the secured creditor benefitted from the expenditures or services. *See Orfa II, supra*, slip op. at *13; *Mechanical Maintenance, supra*, 128 B.R. at 389; and *In re Trenge*, 127 B.R. 552, 555 (E.D.Pa.1991).

■ The second test, known as the subjective test, queries whether the secured creditor consented to the expenditures which the movant seeks to recoup. *See Orfa II, supra*, slip op. at *14; *Orfa I, supra*, 149 B.R. at 799; *Cann & Saul, supra*, 86 B.R. at 418; and *In re Birdsboro Casting Corp.*, 69 B.R. 955, 959 n. 3 (Bankr.E.D.Pa.1987) (Fox, J.). *See also McKeesport Steel Castings, supra*, 799 F.2d at 94; *In re Bob Grissett Golf Shoppes, Inc.*, 50 B.R. 598, 602–03, 609–10 (Bankr.E.D.Va.1985), *on reconsideration*, 76 B.R. 89 (Bankr.E.D.Va.1987); and *In re*

*Hotel Associates, Inc.*, 6 B.R. 108, 110–12 (Bankr.E.D.Pa.1980). If the court determines that the secured creditor has consented to the expenditures, then the movant will be entitled to § 506(c) relief on the theory that "a secured lender should not be able to call upon a professional to perform services on its behalf, and then deny payment to the professional because hindsight proves that the services did not provide the anticipated benefit." *Orfa I, supra*, 149 B.R. at 799.

■ Generally, a movant can only satisfy the subjective test only if it is able to show that the secured creditor gave its unequivocal consent to the specific expenditures or services for which the movant seeks reimbursement. *Cf. In re Combined Crofts Corp.*, 54 B.R. 294, 299 (Bankr.W.D.Wis.1985) ("Where 'consent' does not result from a fully voluntary and self-interested agreement arrived at between the secured party and the debtor it is inequitable to apply a 'consent' theory to effect a reimbursement [under § 506(c) ] to the debtor."). Although consent may be shown circumstantially through the secured creditor's actions, *see Bob Grissett, supra*, 50 B.R. at 602–03, 09–10; and *Hotel Associates, supra*, 6 B.R. at 110–12, it is not to be lightly inferred. *See also, e.g., In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 77 (2d Cir.1984) ("Although a secured creditor may consent to bearing the costs of professional fees incurred by a debtor in possession, 'such consent is not to be lightly inferred,'" quoting *In re S & S Industries, Inc.*, 30 B.R. 395, 398 (Bankr.E.D.Mich. 1983)). *Accord, Orfa I, supra*, at 799; *In re Sherrill*, 78 B.R. 804, 809 & n. 10 (Bankr. W.D.Tex.1987); *Birdsboro Casting, supra*, 69 B.R. at 959 n. 3; and *In re Roggio*, 49 B.R. 450, 453 (Bankr.D.Conn.1985). *See also* 3 COLLIER, *supra*, ¶ 506.06, at 506–61 to 506–63.

As we noted in *Nutri/System II, supra*, slip op. at *3, the Landlords' Complaints speak only of the Heico Defendants' benefit

---

**10.** As we noted in *Nutri/System I, supra*, slip op. at *9 n. 4; and *Nutri/System II, supra*, slip op. at *5 n. 3, it is well-established in this Circuit that a creditor or administrative claimant may seek to surcharge the collateral of a secured creditor under § 506(c) notwithstanding that Code sec-

tion's reference to "the trustee." 11 U.S.C. § 506(c). *See In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94 (3d Cir.1986); *In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 390 (E.D.Pa.1991); and *In re Lloyd Securities, Inc.*, 163 B.R. 242, 255 (Bankr.E.D.Pa.1994).

from their leaseholds, not of any consent by the Debtors, the Bank Group, or the Heico Defendants to the Landlords. Consequently, we were quite surprised when the Landlords not only sought summary judgment in their favor as to Counts III, but emphasized their entitlement to relief under the subjective test, as opposed to the objective test. Although this court has recognized for some time that the Landlords might be entitled to some relief under the objective test,[11] it was never clear to us that the Landlords were entitled to any relief under the subjective test.

The Landlords' decision to vigorously pursue the subjective test avenue appears to have been a strategic (or pragmatic) one. Under the objective test, any recovery by the Landlords would be limited to the reasonable benefit they imparted upon the Defendants. Under the subjective test, however, the Landlords, if successful, might be entitled to recover their entire administrative rent claims, regardless of benefit to the Defendants. *But see Orfa II, supra,* slip op. at *14 (consent to all actions taken by a trustee cannot be implied from a joinder in the trustee's appointment). In any event, we find that the Landlords have failed to meet their burden of proof under either test.

(i) *The Landlords Did Not Satisfy The Objective Test*

■ As the Defendants suggest in their brief, it appears that the Landlords have abandoned their § 506(c) surcharge claim under the objective test even though they may well have been entitled to some relief under that theory. *See, e.g., In re Scopetta–Senra Partnership III,* 129 B.R. 700 (Bankr. S.D.Fla.1991) (landlord who provided post-petition lease space without receiving any

administrative rent provided benefit to the secured creditor by storing its collateral, preserving the debtor's franchise operations, and ensuring the debtor's continued operations). *See also In re Gain Electronics Corp.,* 138 B.R. 464 (Bankr.D.N.J.1992); *In re Opti–Gage, Inc.,* 124 B.R. 515 (Bankr. S.D.Ohio 1991); *In re International Club Enterprises, Inc.,* 105 B.R. 190 (Bankr.D.R.I. 1989); *In re World Wines, Ltd.,* 77 B.R. 653 (Bankr.N.D.Ill.1987); and *In re Proto–Specialties, Inc.,* 43 B.R. 81 (Bankr.D.Ariz.1984) (all holding that landlords were entitled to surcharge the secured creditors' collateral for the costs of post-petition rent and/or storage charges).

■ It appears that difficulties of proof of their § 506(c) claims under this theory discouraged the Landlords from pursuing this option.[12] Although many courts are willing to make "necessary" and "beneficial" determinations without much of an evidentiary record, *see, e.g., International Club, supra,* 105 B.R. at 194; and *World Wines, supra,* 77 B.R. at 658 (both courts summarily conclude that the storage services provided by the landlords were both necessary and beneficial to the secured lender), the movant must still quantify the benefit to the secured party. *See, e.g., Scopetta–Senra, supra,* 129 B.R. at 702 ("[The] Creditor['s] Motion to Surcharge is granted and an evidentiary hearing shall be set for the determination of the amount of the surcharge."); *World Wines, supra,* 77 B.R. at 658 ("[A] prove-up hearing on [the creditor's § 506(c) ] damage claim for storage fees [will be scheduled]."); and *Proto–Specialties, supra,* 43 B.R. at 83 ("To establish benefit, the trustee must demonstrate in quantifiable terms he has expended funds 'which directly protect and preserve

---

**11.** Our Order dated August 4, 1993, granting N/S's motion to liquidate the personal property located at the various Company Stores was entered "[w]ithout prejudice to the creditors' committee's rights or any other entity to proceed under § 506(c) against the *Bank Group* for payment of rental fees, post-petition." (emphasis added).

**12.** Or perhaps it was because any recovery under this test is capped by the value of the collateral preserved which is, in this case, approximately $50,000. *See Scopetta–Senra, supra,* 129 B.R. at

701 ("[A] secured creditor who received a direct benefit from the rendition of services or provision of goods by an administrative claimant of the estate *should have the collateral charged* for such benefit....") (emphasis added); and *Opti–Gage, supra,* 124 B.R. at 520 ("The Bank benefitted from the sale of the merchandise and equipment and, under Bankruptcy Code Section 506(c), *the fund created by the sale proceeds is the source from which the payment of the costs must be made* to pay for the Bank's benefit.") (emphasis added).

the collateral,'" quoting *In re Sonoma V*, 24 B.R. 600, 603 (Bankr.9th Cir.1982)).

It appears that the Landlords would be hard-pressed to show that the benefits of their post-petition services to the Defendants equalled the aggregate amount of their individual administrative rent claims. Regardless, the Landlords did not put on any evidence regarding (1) the period of time that each Landlord provided services to the Defendants, *see, e.g., Opti–Gage, supra*, 124 B.R. at 518 ("The court must determine the factual issue of whether the Bank benefitted, *and for what period of time*, from the use of the premises for storing, demonstrating, and selling the equipment and machinery which was its collateral, and which was of benefit to the Bank.") (emphasis added); (2) the value of those services as measured by the reasonable rent to be charged for the space provided, *see, e.g., id.* at 518 ("The contract lease rate is not necessarily determinative of the amount of the administrative claim.... Instead the debtor is only required to pay the reasonable rental value of the premises."); *but see Proto–Specialties, supra*, 43 B.R. at 84 ("The rental rate specified in the lease is presumptively reasonable for purposes of determining an administrative claim.");[13] (3) the value of those services as measured by the reasonable storage fee to be charged for the space provided, *see, e.g., International Club, supra*, 105 B.R. at 194 ("Although $1700 per week is reasonable for the use of the premises as a restaurant/nightclub, [the creditor's] use of the property was *solely* for storage, and to charge [the creditor] for use and occupancy at the lease rate would be unreasonable....") (emphasis in the original); or (4) the value of those services as measured by the increase in the going concern value of the Debtors' business generally.

*See, e.g., Gain Electronics, supra*, 138 B.R. at 465 ("This [benefit] figure was calculated as the difference between the appraised value and the sale price of the bulk of the equipment ... [stored by the landlord and eventually] sold to Boeing.").[14] Indeed, the Landlords did not submit into evidence even so much as the rent rates charged by all of the representative plaintiff Landlords, much less those charged by each of the members of the entire classes.

Because the Landlords have failed to offer even a scintilla of evidence regarding the value of the alleged benefit imparted upon the Heico Defendants, they have failed to meet the objective test for § 506(c) relief. *See generally Trenge, supra*, 127 B.R. at 556–59 (without proof of the reasonableness of the expenditures, or even a rough estimate of the value of the benefit allegedly imparted on the secured creditor, § 506(c) relief should not have been granted).

### (ii) *The Landlords Did Not Satisfy the Subjective Test*

The Landlords do not assert that the Heico Defendants expressly promised to pay the Landlords' administrative rent claims. Therefore, their only possible contention is that we should infer the Heico Defendants' consent to such expenses from their actions, or the actions of those they allegedly controlled, in order to grant the Landlords § 506(c) relief under the subjective test. We have little difficulty concluding that it would be improper to infer such consent on the basis of the record made at the instant trial.

First, we note again that the collateral, which was allegedly benefitted by the Landlords' services, was in the hands of the Bank Group for most of the time in question.

13. Even if the contract lease rates were the applicable measure of damages, as we note below, the Landlords did not provide us with even that piece of evidence.

14. Apparently in response to our observation that most of the administrative rent was accrued prior to the time NSI purchased the Bank Group's claim and that "[t]o the extent that the Landlords' expenditures or services benefitted the collateral while ... in the hands of the Bank Group, this benefit presumably was reflected in the price

the Bank Group was able to negotiate for its secured claim ... and ... already ... realized by it," *Nutri/System II, supra*, slip op. at *4, the Landlords point out that the purchase price offered by the Heico Defendants had not changed since the inception of the parties' pre-petition negotiations. Of course, this two-edged sword also suggests that the Landlords' post-petition services did nothing to increase the going concern value of the Debtors' operation.

Thus, it is the Bank Group which would have had to have given its consent to the Landlords for § 506(c) to have become applicable during much of the pertinent period. It is clear that the Bank Group did not give such consent. In fact, the Bank Group expressly declined to approve the use of its cash collateral for the payment of administrative rent, *see* page 860 *supra,* and the Bank Group sought relief from the stay at a fairly early stage in the case to foreclose on its collateral. *Compare Sports Information, supra,* 64 B.R. at 825, 827 (lender purposely omitted rent from the list of items to be paid with its cash collateral, and, therefore, "it would be an incredulous interpretation of these facts for this court to find that [lender] consented" to such expenses). Furthermore, the Bank Group, at later junctures, did absolutely nothing to suggest to the Landlords that it would presently or ultimately pay their administrative rent claims.

Of course, the Landlords are not attempting to recover their administrative claims from the Bank Group, but from the Heico Defendants. Therefore, we must determine whether the Heico Defendants can be held responsible for such claims while the senior secured claim was in the hands of the Bank Group. In this regard, we previously observed that,

> in order for Landlords' theory to work, we must infer, at a minimum, either that the Bank Group was also under the alleged control of the Heico Defendants, or that the secured claim sale was a certainty at the time [the Heico Defendants] allegedly influenced the Debtors to take the actions which resulted in the [Landlords'] alleged injury.

*Nutri/System II, supra,* slip op. at *4.

Although the Landlords acknowledge that the Heico Defendants did not control the Bank Group, they assert that the Heico Defendants controlled the Bank Group's senior secured claim. Thus, they contend that the "true" claimant(s) (the Heico Defendants) under that claim consented to the Landlords' services, which would benefit what the Heico

Defendants knew would become their collateral, when they caused the Debtors (1) to not reject the Landlords' leases during the initial 60–day breathing spell of § 365(d)(4); and (2) to file the Lease Extension Motions.

The Landlords' theory is simply too tenuous. It was never clear that the Bank Group would eventually be granted relief from the stay in order to transfer the Group's claims to the Heico Defendants, especially when other potential plan proponents were on the scene and being courted by the Franchisees. Furthermore, the Heico Defendants' involvement in those decisions referenced at pages 860–61 *supra,* affecting the Landlords' leases is by no means certain. The flaw in this theory, like Counts I and II before it, is the Landlords' inability to prove that the Debtors were, at all times, puppets responding only to the tugs of the Heico Defendants.

The Landlords have thus not shown their entitlement to relief under § 506(c) pursuant to either the objective test or the subjective test. Therefore, Counts III of the Complaints must be dismissed.

## D. CONCLUSION

For all of the foregoing reasons, judgment shall be entered in favor of the Defendants on all three Counts, and the Complaints shall be dismissed in their respective entireties. Since we have held dismissal of the Debtors' cases in abeyance since February 22, 1994, pending only the final disposition of the Proceedings, we will also proceed to dismiss these cases at this time as well.