**In re NUTRI/SYSTEM OF FLORIDA ASSOCIATES.**

**ANSEL PROPERTIES, INC., et al.**

v.

**NUTRI/SYSTEM OF FLORIDA ASSOCIATES, et al.**

**In re NUTRI/SYSTEM, INC.**

**MB LIMITED PARTNERSHIP, et al.**

v.

**NUTRI/SYSTEM, INC., et al.**

Civ. A. Nos. 94–4830, 94–4859.
Bankruptcy Nos. 93–14121(DAS), 93–12725(DAS).
Adv. Nos. 93–0942, 93–0941.

United States District Court,
E.D. Pennsylvania.

Feb. 16, 1995.

Margaret S. Woodruff, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, Eugene J. Frett, Chicago, IL, for Nutri/System of Florida Associates in Civ.A. No. 94–4830.

Bruce S. Sperling, Eugene J. Frett, Chicago, IL, for Nutri/System, Inc., in Civ.A. No. 94–4859.

Andrew Bershad, Alan C. Gershenson, Howard T. Glassman, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Donald M. Smith, Virginia L. VanMaanen, Allied Amboy Co., Washington Mut. Sav. Bank, Ansel Properties, Inc., Angelo S. Mallozzi, Westmont Enterprises, Rreef Mid America/East–V Rosedale Square, Inc., The Clinton Employment Center Associates, L.P., Harlington Realty Corp., The J.S. Co., Foothill & La Crescenta Associates, Morse Road Co., MB Ltd. Partnership in Civ.A. No. 94–4859.

Nicholas J. Le Pore, II, Margaret S. Woodruff, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for Nutri/System, Inc. in Civ.A. No. 94–4859.

Frederic J. Baker, U.S. Trustees Office, U.S. Dept. of Justice, Philadelphia, PA, pro se.

## MEMORANDUM AND FINAL JUDGMENT

HUTTON, District Judge.

Andrew Bershad, Alan C. Gershenson, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Ansel Properties, Inc., Rreef Mid America East–IV, Inc. in Civ.A. No. 94–4830.

Robert A. Hendricks, Grand Rapids, MI, for Official Creditor Committee in Civ.A. Nos. 94–4830 and 94–4859.

Bruce S. Sperling, Eugene J. Frett, Chicago, IL, for Heico Acquisition Co., Inc., Heico Cosmetics, Inc., NSI Debt, Inc. in Civ.A. Nos. 94–4830 and 94–4859.

Lee A. Rosengard, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for NSI Acquisition Ltd. Partnership in Civ.A. Nos. 94–4830 and 94–4859.

### I. BACKGROUND

This is an appeal from the Bankruptcy Court's final judgment entered in favor of the Appellees on July 8, 1994. *In re Nutri/System, Inc.*, 169 B.R. 854 (Bankr.E.D.Pa. 1994). The appellants are former landlords of debtors Nutri/System, Inc. (N/S) and Nutri/System of Florida Associates (N/SF). On December 22, 1993, the appellants, who had leases with N/S and N/SF, filed two class actions, one against N/S and the other against N/SF. Named as defendants in the two class actions were the debtors and several entities ("Heisley Defendants") controlled by Michael Heisley ("Heisley") which were all involved in the acquisition of the debtors'

assets.[1] The two class actions were consolidated for trial.

The appellants filed the class actions in order to attempt to recoup lost post-petition administrative rents from the appellees. The appellants proffered three theories of recovery. First, the appellants claimed that the appellees' secured claims should have been equitably subordinated to the appellants' claims pursuant to 11 U.S.C. § 510(c). Second, the appellants claimed that the debtors' corporate veil should be pierced. Third, the appellants claimed that they were entitled to a surcharge on the appellees' collateral in an amount equal to their claims pursuant to 11 U.S.C. 506(c). The Bankruptcy Court found that the appellants had failed to produce sufficient evidence to support a claim under any of the proffered theories of recovery.

The two actions were originally assigned to separate district judges on appeal. Subsequently, however, the actions were assigned to this Court. Considering the virtually identical nature of the two actions and the consolidation below, they will be consolidated for the purpose of appeal.

The factual findings made by the Bankruptcy Court are not in dispute and are as follows:

N/S operated and franchised weight loss centers which administered weight loss programs and sold diet foods. In 1991, N/S ran into financial difficulties, and began a search for investors to either provide capital or purchase N/S. To facilitate the search, N/S hired a broker in 1992. In January, 1992, the broker was subsequently replaced by Arthur Anderson & Co. ("Arthur Anderson"), a national accounting firm. Brian Haveson ("Haveson"), an Arthur Anderson employee, who later became an employee of one of the Heico Defendants conducted the search for potential investors. Haveson introduced N/S to a number of potential investors, including Heisley.

At the time Haveson started introducing possible investors to N/S, a consortium of banks (the "Bank Group") held $40,000,000 in senior secured debt of N/S. None of the possible investors located by Haveson came close to offering the amount of the Bank Group's senior secured debt. The proposals ranged from $10,000,000 to $21,000,000. The high offer, however, was not considered to be a serious offer by N/S. Heisley's offer was approximately $12,500,000.

In March, 1993, Heisley and his employees began performing a "due diligence" inspection of N/S. Arthur Anderson considered Heisley's offer to be superior to all others and advised N/S to accept it. Negotiations then ensued between Heisley and N/S.

On April 27, 1993, however, before these negotiations could proceed, the Bank Group, concerned that N/S was going to declare bankruptcy, seized N/S's accounts (the "Bank Sweep"). N/S's management, and even Heisley, attempted to convince the Bank Group to release the seized funds. The Bank Group refused and as a consequence, N/S was forced to shut down its operations. N/S instructed all the stores it owned ("Company Stores") to close down the next day, and N/S employees were instructed not to report to work. N/S also ceased shipping food products to its stores. In an attempt to restart food distribution a group of franchisees (the "Franchisees"), filed an involuntary Chapter 7 Bankruptcy against N/S on May 4, 1993.

On May 6, 1994, an expedited hearing was held on a motion of the Franchisees to appoint an interim trustee. At that hearing, all the interested parties, the Bank Group, the Franchisees, and the shareholders and management of N/S, were in favor of allowing HAC to step in and manage N/S, instead of a trustee. In addition, Heisley represented to the Court that he was still interested in purchasing N/S's assets, and was opposed to the appointment of a trustee. At the end of the hearing, the Bankruptcy Court entered an order stating that unless the Bankruptcy Court was notified by 12:00 p.m. on May 7, 1993 that HAC had acquired effective control of N/S, the Court would appoint an interim trustee. The Court did not receive notice by

---

1. In addition to the debtors, the other named defendants (now appellees) are: Heico Acquisition Co., Inc. ("HAC"), Heico Cosmetics, Inc. formerly Heico Food Acquisition, Inc., ("HFA"), NSI Debt, Inc. ("NSI"), and NSI Acquisition Limited Partnership ("NSLIP").

12:00 p.m. on May 7, 1993, and thus an interim trustee was appointed.[2]

A few days later, the Franchisees who had originally filed the motion for appointment of the trustee, filed an emergency motion to vacate the appointment of the trustee. A hearing was held on May 10, 1993. At the hearing, it was established that HAC was in control of the N/S and that all interested parties, including the Franchisees, the Bank Group, and the former management and shareholders of N/S, but not the trustee, were in favor of removing the trustee and placing Heisley in control. On May 12, 1993, the Bankruptcy Court vacated the appointment of the trustee.

At the same time the trustee was removed, the Board of Directors of N/S voluntarily resigned and were replaced by Heisley and two of his employees. The new board elected Heisley chairman and chief executive officer of N/S. N/S then brought back certain key employees, who had left N/S after the bank sweep, to run the day to day operations of N/S. Joel Rosen, one of the key employees brought back and N/S's general counsel, suggested that N/S hire the firm of Schnader, Harrison, Segal and Lewis ("Schnader") as bankruptcy counsel. Because of concern that administrative claimants such as the debtors' outside professionals would not get paid for their services because of the size of N/S's secured debt, Heico, Inc., an entity controlled by Heisley and not a party to this action, guaranteed Schnader's fees. Subsequently, the Bankruptcy Court approved of Schnader's appointment.

During May, 1993, Heico continued its negotiations with the Bank Group regarding the purchase of N/S's assets. In early May, 1993, the parties drew up an unsigned term sheet under which Heico would purchase the assets of N/S from the Bank Group for $14,-000,000. The Term Sheet outlined that in order for the transaction to go forward, the Bank Group would have to secure relief from the automatic stay to foreclose on its collateral (N/S's assets) and then the Bank Group was to sell the foreclosed-upon assets to Heico in an extrajudicial foreclosure sale. The

term sheet also recited that the Bank Group would consent to the conversion of N/S's bankruptcy to Chapter 11 and to a cash collateral agreement under which cash would be provided to N/S to facilitate distribution and sale of food to Franchisees. The agreement between the Bank Group and HAC was not formalized until an agreement was executed on August 30, 1993.

On June 3, 1993, the Franchisees, with the consent of N/S and the Bank Group, filed an amended involuntary petition seeking to convert the bankruptcy proceeding to Chapter 11. The Franchisees were willing to accommodate the debtors in the conversion of the case because arrangements had been made to start food distribution. Indeed, HFA had, at its own expense, began to distribute food to the Franchisees. The Bankruptcy Court converted the case to Chapter 11 on June 4, 1993.

On June 11, 1993, N/S filed an application requesting authority to use the cash collateral it was to receive from the Bank Group pursuant to the cash collateral arrangement with the Bank Group. After an expedited hearing on June 16, 1993, the Court issued an interim order which was later extended by subsequent interim orders through November, 1993, approving the use of the Bank Group's cash collateral for restarting the distribution of food and to allow N/S to reopen a few Company Stores. In addition, the interim order required N/S to waive all claims under 11 U.S.C. § 506(c).

Also at this point, N/S requested that the Bank Group allow it to use funds received pursuant to the cash collateral agreement to pay rent to the appellants. The Bank Group, however, refused and only authorized the payment of two-months of future rent on five reopened "test" stores.

On July 21, 1993, the Bank Group filed a motion for relief from the automatic stay in the N/S case. The motion, if granted, would have allowed the Bank Group to foreclose on N/S's assets pursuant to its loan agreements and applicable state law. A hearing was scheduled on the Bank Group's motion, but

---

**2.** On May 7, 1993 at sometime after noon, the Court did receive notice that HAC had obtained control of N/S. However, the Order became effective because the noon deadline was not met.

the hearing was continued and no hearing was ever held on the Bank Group's Motion because on September 9, 1992, N/S filed a motion ("Sale Motion") requesting that the Bankruptcy Court approve bidding and other procedures for the sale of virtually all of its assets, pursuant to 11 U.S.C. § 363(b). The sale motion was opposed by the Franchisees and the Counsel for the Creditors Committee because these parties wanted to entertain overtures from two prospective purchasers other than the Heico Defendants. To accommodate the objectors, the Bankruptcy Court continued a hearing scheduled for September 15, 1993 on the Sale Motion until September 22, 1993, and then to October 6, 1993.

Up until and after October 6, 1993, no consensus was reached as to whom the most appropriate purchaser of N/S. The Franchisees, at this time, favored the proposal of Regal Acquisition Co. ("Regal") to that of the Heico Defendants' proposal. In light of the dispute as to the most appropriate buyer, N/S withdrew the Sale Motion. Thus, only the Bank Group's motion for relief from the automatic stay remained before the Court. At the close of the hearing on October 6, 1993, the Bankruptcy Court issued an order requiring the stay to remain in effect until November 3, 1993 at which time the Bankruptcy Court would determine whether a viable plan of reorganization had been filed by any interested party. Regal filed a plan of reorganization on October 29, 1993. On November 3, 1993, however, the Franchisees announced that they were now in favor of Heico's offer. Regal then withdrew its plan. Accordingly, the Bankruptcy Court granted the Bank Group relief from the automatic stay.

On November 24, 1993, N/S filed another motion pursuant to 11 U.S.C. § 363(b) seeking to establish bidding and other procedures to sell its assets to the Heico Defendants. On December 1, 1993, NSI and the Bank Group entered into a final agreement under which the Bank Group would sell NSI its Senior secured debt in N/S and N/SF for $14,000,000. Despite the various agreements and support of most interested parties for the sale, the Bankruptcy Court denied N/S's motion finding that § 363(b) was an inappropriate mechanism for the sale because N/S did not intend to reorganize. A hearing was then scheduled for December 15, 1993, at which N/S was to inform the Court of its intentions of how it was now going to proceed with its case.

On December 15, 1993, the Court was informed that N/S intended to allow the Bank Group to foreclose on its assets, and then transfer the assets to the Heico Defendants. Also, on December 15, 1993, NSI filed a motion to dismiss the N/SF case or, in the alternative, obtain relief from the automatic stay in the N/SF case. A hearing on this motion was held on December 23, 1993 and relief was granted from the stay in the N/SF case.

On December 28, 1993, a public foreclosure sale of N/S and NS/F's assets was held. The assets of both debtors was purchased by NSI. The next day, NSI transferred the assets to NSLIP, which subsequently changed its name to Nutri/System L.P. N/S and N/SF were left as empty corporate shells after these transactions.

On January 20, 1994, N/S refiled its motion to dismiss its bankruptcy case. The next day, N/SF filed a motion to dismiss its bankruptcy case. A hearing on the dismissal motions was held on February 22, 1994 at which time only the defendants in the present case objected to dismissal. At the conclusion of the hearing, the Bankruptcy Court issued an order stating that it would not dismiss the bankruptcy proceeding until the instant case was dismissed, settled or otherwise disposed of. On July 8, 1994, after entering judgment against the appellee, the Bankruptcy Court finally dismissed the bankruptcy proceedings in the N/S and N/SF cases.

During the course of the Bankruptcy proceeding many landlords filed motions for relief from the stay in order to compel N/S to assume or reject leases or pay administrative rent. On July 1, 1993, N/S, faced with 11 U.S.C. § 365(d)(4)'s requirement that a debtor assume or reject nonresidential leases within 60 days, filed a motion to reject certain leases. The motion was granted on July 28, 1994. On August 3, 1993, N/S filed a motion seeking to extend the 60–day period

in which it might assume or reject the remaining leases. Many landlords filed objections to this motion. By Order dated September 14, 1993, the Bankruptcy Court permitted N/S to reject the leases of every landlord who objected to the August 3 motion. The Order also extended the time that N/S could assume or reject the remaining leases. Pursuant to the Order, out of the 283 stores open when the Bank Sweep occurred, 251 leases were deemed rejected.

Most of the properties associated with the rejected leases contained property of little value. Nonetheless these properties had to be emptied out by N/S in order to turn the properties over to the respective landlords. Accordingly, N/S filed a motion on July 27, 1993 seeking permission to liquidate the personalty remaining at the closed stores. The liquidation process would be financed from the proceeds of the sale of the personalty. On August 3, 1993, the Bankruptcy Court approved the motion. Soon, thereafter, N/S hired Arthur Rea, a former N/S executive, to carry out the liquidation of the personalty. Rea began the liquidation process which lasted through February, 1994. However, most of the Company Stores were vacated by September 1, 1993.

With respect to the overall proceedings in the N/S and NS/F Bankruptcies the Bankruptcy Court found:

> [T]he Landlords case is simply this: (1) Heisley, through entities he controls, took control of the Debtors with the intent to operate them in bankruptcy until such time as he could purchase their assets; and (2) along the way, the Landlords were harmed by not being paid their administrative rent.... Although Heisley's self-interest may, at first glance, give pause to one not familiar with the Debtors' cases, it must be remembered that this very self-interest, which was fully disclosed at all times during the bankruptcies, is what made his involvement in the management of the Debtors so attractive to the Franchisees, the Bank Group, and other creditor entities, including, after a change of counsel, the Creditors' Committee, as well as the Debtors' original directors, officers, and shareholders, and almost every other

interested party who took an active role in these bankruptcy cases.

> Because Heisley was interested in preserving the Debtors, their operations, and their assets for eventual purchase, he was the only party willing to actually invest in the Debtors during the critical early portion of the Debtors' bankruptcies. The parties in interest, realizing that Heisley's involvement in the bankruptcy cases would inure to their benefit, rallied around him and urged this court to allow him to mange the Debtors at the commencement of the Case, as opposed to the Trustee. Thus, this is not a case of an existing insider who, dressed in the lamb's clothing of selfless motivation for the benefit of the firm, seeks, in actuality, to steal corporate opportunities or engage in self-dealing. Rather, we have an interested suitor (a white knight, if you will) agreeing to operate the Debtors post petition in an attempt to preserve, and possibly enhance, the value of their assets....

> Reviewed in toto, Heisley's and the Heico Defendants' management of the Debtors has been aboveboard.... All corporate formalities have been maintained. There is no evidence the Debtors have not complied with the administrative requirements of the Bankruptcy Code. Nor is their [sic] any evidence that the Debtors, the Heico Defendants, or Heisley himself have surreptitiously taken any action which would have otherwise required bankruptcy court review and approval after notice and hearing. Every step of the way, the Debtors, the Heico Defendants, and, for that matter, all other parties implicated by the Landlords' allegations, have sought and secured court approval before taking almost every action involving the Debtors, the Landlords' leases, or the senior secured claims. And, at each one of these junctures, it has always been made clear to this court what interest, if any, Heisley had in the proposed action or the events to follow the proposed action.

> After scrutinizing those aspects of the bankruptcies which impacted upon the Landlords, their leases, and their administrative rent claims, we likewise find noth-

ing sinister. Although the Debtors possibly could have addressed their lease situations more quickly than they did, there is no evidence that the Landlords and their leases were tied up intentionally so that the Debtors or the Heico Defendants could derive some benefit at the Landlords' expense. There was no evidence presented which would suggest that the maintenance of the Company Stores was critical to the N/S distribution network or improved the Debtors' going concern value, except perhaps in the State of New York.... Indeed, the Bank Group and Heisley thought that the Company Stores were for the most part a liability to the value of the Debtors' assets. Nor were the contents of these Company Stores of great value to any party. We were impressed by the testimony of Rea that he vacated the Company Stores as quickly as possible given the difficult logistics of the task and the limited funds available to complete it. We would generally describe the Debtors actions vis-a-vis the Landlords by stating only that the complexity of the bankruptcies, the lack of surplus capital, and the large number and wide geographic distribution of the Company Stores resulted in a slower rate of vacancy than the Landlords, quite understandably, would have liked.

Finally, with regard to the reopening of the Company Stores, the Lease Extension motions, and the liquidation of the personal property located at Company Stores, we heard uncontroverted testimony that neither Heisley nor his entities were involved in these decisions. Rather, these decisions were apparently made by N/S's President, Mark A. Miller, a former vice president and longtime employee of the N/S who was hired by Heisley (or possibly the Trustee before him) to manage the day-to-day operations of N/S. Although Heisley, as CEO and chairman of the board, had the last word on all corporate decisions, the origin of these particular decisions suggests that they were made as part of the ordinary management process, and not as part of a scheme masterminded by Heisley and carried out by the Debtors, acting in the capacity of straw men.

*Nutri/Systems,* 169 B.R. at 863–65.

## II. DISCUSSION [3]

### A. Standard Of Review

■ A district court's review of questions of law in a bankruptcy appeal is plenary. *Meridian Bank v. Alten,* 958 F.2d 1226 (3d Cir.1992). Review of findings of fact will not be set aside unless they are found to be clearly erroneous. Bankr.R. 8013; *Meridian,* 958 F.2d at 1229. As to mixed questions of law and fact the district court must break down the question and apply the appropriate standard to each component. *Id.* A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (*quoting United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). If the dis-

---

3. As in the Bankruptcy Court proceedings, the appellants here fail to differentiate between the liability of the myriad of defendants. Indeed, the appellants filed the exact same brief in the N/S and N/SF appeals. Because of the Court's ultimate finding that the Bankruptcy Court did not err, the Court will treat all the appellants as one entity. Like the Bankruptcy Court, this Court will not attempt to infiltrate the miasma of distinguishing between the liability and actions of the various entities, a distinction which should have been made by the appellants in the court below. The Bankruptcy Court explained the efficacy of treating the appellees as one entity:

The Landlords [Appellants] do not name Heisley as a Defendant, and lump the Debtors and the Heico Defendants together as if there was only one defendant—and one bankruptcy case.

The Defendants assert that the Landlords' failure to differentiate between the Heico Defendants and the two bankruptcy cases, *inter alia,* prevents us from granting them relief. This argument is not without merit.... [I]f we recognize the individuality of each of the Heico Defendant, it is clear that all of them could not be liable on every count of both the Complaints. On the other hand, the Landlords argue that Heisley controlled all off the Defendants. Therefore, they argue, by implication, that the actions of any one can be imputed to the group as a collapsed single entity. Because we enter judgment in favor of the Defendants on all three counts, we need not attempt to wade through this quagmire.

*Nutri/Systems,* 169 B.R. at 863 n. 3.

trict court determines that the findings of fact of the bankruptcy court are not clearly erroneous, the district court must determine whether the factual findings are legally sufficient to support the bankruptcy court's conclusions of law. *Universal Minerals v. C.A. Hughes & Co.,* 669 F.2d 98 (3d Cir.1981).

## B. *Piercing The Corporate Veil*

The appellants claim that the Bankruptcy Court erred in finding that the corporate veil of the Heico Defendants should not be pierced because the appellants failed to prove that the Heico Defendants dominated the debtors so that the debtors had no independent corporate existence of their own and that the appellees were utilizing the debtors to commit a fraud or an injustice.[4]

It is axiomatic that under the doctrine of limited liability a corporation is a legal entity separate and distinct from its owners and thus, only the corporation, not the owners, are liable for the corporation's debts. Based on this legal fiction "large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944). The legal fiction of a separate existence, or, as commonly referred to the corporate veil may, however, be pierced under Pennsylvania law when "the corporation was an artifice and sham to execute illegitimate purpose and an abuse of the corporate fiction and immunity that it carries." *Kaplan v. First Options of Chicago,* 19 F.3d 1503, 1521 (3d Cir.1994) *(quoting Wheeling–Pittsburgh Steel Corp. v. Inter-*

*steel, Inc.,* 758 F.Supp. 1054, 1058 (W.D.Pa. 1990)).

■ In order for the corporate veil to be pierced, a plaintiff must first make a threshold showing of control of the corporation that the plaintiff seeks to pierce, which is more than mere majority or complete stock control, but is complete domination, not only of finances but of policy and business practice in respect to the transaction attacked, so that the corporate entity at the time of the transaction had no separate mind, will or existence of its own. *See Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 150 (3d Cir.1988); *see also Culbreth v. Amosa (Pty), Ltd.,* 898 F.2d 13, 15 (3d Cir.1990) (finding that the control necessary to fulfill first factor is "a showing that the controlled corporation acted robot—or puppet—like in mechanical response to the controllers tugs on its strings or pressure on its buttons"). Second, the plaintiff must show that injustice, fraud, illegality, or defeat of public policy would result if the court does not pierce the corporate veil. *See Kaplan v. First Options of Chicago,* 19 F.3d 1503, 1521 (3d Cir.1994); *see also Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279, 284 (3d Cir.1983) (stating that the alter ego concept is a "tool of equity [that] is appropriately utilized 'when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from public liability for a crime'" (internal citations omitted)). Third, a plaintiff must show that the defendant's inequitable use of the corporation was the proximate cause of the injury complained

4. The appellants distinguish between the alter ego theory and the instrumentality rule as theories justifying the piercing of the corporate veil. However, courts have generally utilized these terms interchangeably to denote the same equitable principle: in certain extraordinary situations equity may require a court to disregard a corporation's separate existence in order to impose liability on the person or entity that is dominating the corporation and using the corporation for illegitimate purposes. *See, e.g., Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939) (finding that the instrumentality rule "is not, properly speaking, a rule, but a convenient way of designating the application, in particular circumstances, of the broader equitable principle that the doctrine of corporate

entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice"); *United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686 (5th Cir.1985) (describing that the corporation that is being controlled may be described as an "alter ego," "agent," or "instrumentality" of the person or entity in control); *Berkowitz v. Allied Stores of Penn–Ohio, Inc.,* 541 F.Supp. 1209, 1215 (E.D.Pa.1982) (finding no substantive difference between the instrumentality rule and the alter ego doctrine). Thus, for the purpose of this appeal the Court will rely on the overarching equitable principle described above, but for reasons of uniformity and clarity will refer to it as the alter ego doctrine as the Court below did and the parties to this appeal do.

of. *See Realco Services, Inc. v. Holt,* 513 F.Supp. 435 (E.D.Pa.1980).

■ Factors to be considered when deciding whether to pierce the corporate veil include:

(1) gross undercapitalization;

(2) failure to observe corporate formalities;

(3) non-payment of dividends;

(4) insolvency of the debtor corporation;

(5) siphoning of funds of the corporation by the dominant shareholder;

(6) non-functioning of other officers or directors;

(7) absence of corporate records; and

(8) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981). Many of the factors enumerated above (*i.e* undercapitalization, non-payment of dividends, and insolvency of the debtor), as the Bankruptcy Court correctly pointed out, do not apply when the alleged controlled corporation is in bankruptcy. Indeed, when the inequitable use of control is alleged to occur in bankruptcy, a plaintiff must also overcome the burden of explaining how the Bankruptcy Court and other interested third parties, which may include secured and unsecured creditors, a creditors' committee or a trustee, either condoned or did not detect the inequitable conduct.

In this case, the appellants first argue in support of the first factor of the test outlined above that the Heisley Defendants "so completely dominated and controlled the Debtors that the Debtors had no separate will or existence." (Appellants Brief at 40).

In addressing this claim, the Bankruptcy Court utilized the same legal standard as articulated above. Thus, since the factual findings of the Bankruptcy Court are not in dispute, in order for this Court to find that the Bankruptcy Court erred it must find that the factual findings are not legally sufficient to sustain the Bankruptcy Court's conclusion of law. *Universal Minerals,* 669 F.2d at 102.

■ The factual findings regarding the degree of the Heisley Defendants' control of the debtors were:

We have been presented with no evidence that the corporate formalities were dispensed with once Heisley took control of the Debtors.... The Landlords have introduced no evidence that the Heico Defendants were siphoning off funds of the Debtors, nor did they rebut the Debtors' testimony that Heisley actually invested in the Debtors post-petition. Nor are we convinced that the Debtors other directors or and officers were puppets while Heisley called the shots. Indeed, as noted [supra], it was the officers and long time employees of N/S who ran the day to day operations of the Debtors and made many decisions that the Landlords now complain. There was no evidence presented that the Debtors corporate records were missing or incomplete. Finally, it is quite clear that the Debtors are not 'mere facades,' but rather, an international chain of weight loss centers which fell upon hard times.

*Nutri/Systems,* 169 B.R. at 870. As discussed above, in addition to finding that key employees ran the day to day operations and made many of the decisions that are now in dispute, the Bankruptcy Court made numerous findings that other entities wielded control over the debtors, namely the Bankruptcy Court itself, the Franchisees, and the Bank Group. Indeed, it was the Bank Group, not the Heisley Defendants, that refused to release funds for the payment of the administrative rent claims of the appellants. Moreover, the Heico Defendants' purchase of the debtors was not a certainty until after the Franchisees decided to reject Regal's proposal and support the Heisley Defendants on November 3, 1993.[5] Had the Heisley Defen-

5. The Bankruptcy Court described the uncertainty of the Heisley Defendants obtaining control as:

Nor was the outcome of Heisley's acquisition of the Debtors' assets at any time prior to November 3, 1993. Regal appeared at numerous hearings and vigorously and, for a time, successfully wooed the support of many of the Franchisees, whose preferences of an ultimate purchaser were significant to the outcome of the disposition of the Debtors' assets. Heisley did, of course, outlast Regal and was able to consummate the deal which he hoped he had

dants been in complete control of the debtors would they not have made sure that their proposal to purchase control of the debtors would have been approved? These facts clearly establish that although the debtors might appear as marionettes, like many debtors in Bankruptcy, the strings which were controlling their movements were being tugged and pulled in diverse directions by diverse constituencies, all of whose tugs were directed towards benefiting their particular interests. Thus, the Bankruptcy Court's finding that Heisley Defendants did not completely dominate the debtors to the point where the debtors had no separate mind, will or existence of their own was supported by the evidence. *Craig,* 843 F.2d at 150.[6]

■ Assuming, *arguendo,* as the Bankruptcy Court did, that the Heisley Defendants completely controlled the debtors, the evidence did not support a finding that they did so to perpetrate injustice, fraud, illegality, or a violation of public policy. *Kaplan,* 19 F.3d at 1521. The appellants' sole contention of illegitimate conduct by the Heisley Defendants was that they caused a violation of 11 U.S.C. § 365(d)(3) and § 365(d)(4).[7] Pursuant to these sections, the trustee has 60 days from the order of relief to decide whether to assume or reject leases on nonresidential real property. *See* 11 U.S.C. § 365(d)(4). If the trustee does not act within the 60–day window the lease is deemed rejected as a matter of law. *Id.* During the 60–day period, the trustee must perform all obligations

under the leases of the debtor. 11 U.S.C. § 365(d)(3). Where, as here, an estate does not have enough assets to pay its administrative claims, however, a lessor's administrative rent claim does not receive super priority status and receive payment ahead of secured debt. *See In re Orient River Investments, Inc.,* 112 B.R. 126, 134 (Bankr.E.D.Pa.1990); *In re Dieckhaus Stationers of King of Prussia, Inc.,* 73 B.R. 969, 973 (Bankr.E.D.Pa. 1987).

■ The appellants' claim that the Heisley Defendants caused a violation of these sections by forcing the debtor to fail to make current rent payments pursuant to § 365(d)(3) and fail to turn over the leased premises immediately after rejection pursuant to § 365(d)(4). It is undisputed that these sections were violated during the bankruptcy proceeding, at least to some of the appellants' leases. However, whether the appellees were responsible for these violations and, in turn, whether such a violation is the kind of inequitable conduct which would justify a court's piercing the corporate veil as a matter of law are in dispute.

The first question can, as the Bankruptcy Court did, only be answered in the negative. The nonpayment of the administrative rent was not a result of the appellees' domination of the debtors or some nefarious plot to injure the appellants, but rather a result of the impossible. The Bank Group held $40,-000,000 in secured debt, which all parties

---

made with the Bank Group. But this result was, prior to November 3, 1993, far from inevitable.
*Nutri/Systems,* 169 B.R. at 871.

6. Essentially, this finding eviscerates the appellants' remaining claims because they are premised on the assumption that the appellees dominated the debtors. However, in light of the various remaining legal theories and the slight nuances in the Bankruptcy Court's findings under the different theories, the Court will proceed to review the remaining claims.

7. These sections provide in relevant part:

(3) The Trustee shall timely perform all obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of

nonresidential real property real property, until the such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within the 60 days after the date of the order of relief, but the time for performance shall not be extended beyond such 60 day period.... (4) Notwithstanding paragraphs (1) and (2), in any case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

agree was not going to be paid in full.[8] In fact, in the end, the Bank Group only received $14,000,000 of its claim. There are no allegations that the appellees were in any way responsible for the Bank Group's large claim. Thus, the appellees were not responsible for the failure of payment of the administrative rent claims, but rather nonpayment was the result of the priority of the debtors' debt and the Bank Group's specifically refusing to allow payments of the administrative rent.

The Bankruptcy Court found that to the extent there was a violation of § 365(d)(4) because the debtors did not immediately surrender upon rejection, it did not rise to the level of inequity to justify piercing the corporate veil. The Bankruptcy Court found that "the Debtors, through Rea, made every reasonable effort under the circumstances to visit, empty, and surrender the many Company stores located throughout the United States to the Landlords as soon as practicable." *Nutri/System,* 169 B.R. at 867. To the extent that the appellees might have been responsible for an unintentional violation of § 365(d)(4), such violation was *de minimis* and did not rise to the level of inequitable conduct which would justify piercing the corporate veil.

It is an unfortunate incident of the bankruptcy process that certain claims may not be paid when an estate's creditors are undersecured. *See In re Orient River Investments, Inc.,* 112 B.R. 126, 134 (Bankr. E.D.Pa.1990) ("[A] Landlord will not be allowed immediate payment of rentals due under a lease in effect during the period between the bankruptcy filing and assumption

or rejection unless it establishes that there is a likelihood that the debtor will pay all administrative claims."). In the event that the estate is undersecured, it is not the secured creditor's responsibility to pay administrative rent claims. *In re Sports Information Data Base, Inc.,* 64 B.R. 824, 828 (Bankr.S.D.N.Y. 1986) ("In the unfortunate event that the estate lacks unencumbered funds to pay the landlord's administrative rent claim, it does not follow that the secured creditor bears the expense."). The finding of *Sports Information* applies *a fortiori* to the instant case because the appellees were not the secured creditors during the period the administrative rent was not paid. Accordingly, the Bankruptcy Court's finding that the appellees were not responsible for violation of sections 365(d)(3) and (4) or any injuries flowing therefrom that rise to the level of inequitable conduct to justify piercing the corporate veil was correct.[9]

## C. *Equitable Subordination*

The Supreme Court has recognized that "[i]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice and unfairness is not done in the administration of the bankrupt estate." *Pepper v. Litton,* 308 U.S. 295, 307–08, 60 S.Ct. 238, 246, 84 L.Ed. 281 (1939); *see also Burden v. U.S.,* 917 F.2d 115, 117 (3d Cir. 1990). Section 510(c) of the Bankruptcy Code essentially codified the doctrine of equitable subordination enunciated in *Pepper* and the numerous case which subsequently reiterated and refined the doctrine. *See In re*

11 U.S.C. §§ 365(d)(3) & (4).

**8.** The appellants claim that somehow the Heisley Defendants controlled the Bank Group's $40,-000,000 secured claim during the period that the majority of the rent the appellants are claiming accrued. The Bankruptcy Court found this claim to be unsupported. The appellants' purchase of the secured debt cannot be said to be a certainty until after Regal's bid was rejected on November 3, 1993.

**9.** The Bankruptcy Court went on to hold that violations of section 365(d)(3) and (4) do not stand alone, rise to the level of inequitable conduct to justify piercing the corporate veil in the case at bar. Although the above findings that the

appellants were not responsible for the violations makes reaching this issue unnecessary for disposition of this appeal, in the interest of clarity and thoroughness, the Court finds that the Bankruptcy Court's holding on this issue was correct. *C.f. In re Streamlight, Inc.,* 108 B.R. 505 (Bankr. E.D.Pa.1989) (finding that violation of the Bulk Transfer Law did not justify piercing the corporate veil).; *Orient River,* 112 B.R. at 134 (finding that the Bankruptcy Code, especially § 365, provides landlords with adequate remedies for nonpayment of administrative rent and thus, extra code remedies are not warranted.); *Dieckhaus Stationers,* 73 B.R. at 974 (finding that given the Bankruptcy Code protections afforded lessors "it is inappropriate to judicially fashion any additional remedies").

*CTS Truss, Inc.,* 868 F.2d 146, 148 (5th Cir. 1989) (finding that intent of 11 U.S.C. § 510(c) "was to incorporate the doctrines that had been well-developed in the courts for several decades preceding the enactment of the Bankruptcy Code"); *In re M. Paolella & Sons, Inc.,* 161 B.R. 107, 117 (E.D.Pa.1993) (same). Nevertheless, "equitable subordination is an unusual remedy which should only be applied in limited circumstances." *In re Fabricators, Inc.,* 926 F.2d 1458, 1464 (5th Cir.1991); *see also Paolella & Sons,* 161 B.R. at 117 ("[E]quitable Subordination is an extraordinary departure from the 'usual principle of equality of distribution and preference for secured creditors.'") (citations omitted).

Section 510(c) states in relevant part:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principle of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferee to the estate.

11 U.S.C. 510(c).

■ Although Congress did not define equitable subordination or create a test for its application in Section 510(c), the test most courts have applied is the three part test enunciated in *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977). *See, e.g., Paolella & Sons,* 161 B.R. at 117 and cases cited therein; Lawrence P. King, 3 Collier on Bankruptcy ¶ 510.05 (15th ed. 1988). The *Mobile Steel* test requires that before a court may equitably subordinate a claim the movant must establish that:

(1) The claimant must have engaged in some type of inequitable conduct.

(2) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(3) Equitable subordination of the claim must not be inconsistent with the Bankruptcy Act.

*Mobile Steel,* 563 F.2d at 700.

■ The burden of proof required to prove equitable subordination is less demanding when the respondent is an insider. The difference in burdens was astutely described by the Eleventh Circuit as:

The Burden and sufficiency of proof required are not uniform in all cases. Where the claimant is an insider or a fiduciary, the trustee bears the burden of presenting material evidence of unfair conduct. Once the trustee meets his burden, the claimant then must prove the fairness of his transactions with the debtor or his claim will be equitably subordinated. If the claimant is not an insider or fiduciary, the trustee must prove more egregious conduct such as fraud, spoilation, or overreaching and prove it with particularity.

*In re N & D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir.1986). Insider status alone, however, is insufficient to warrant subordination. *In re Fabricators, Inc.,* 926 F.2d 1458, 1467 (5th Cir.1991).

The question of whether a claimant is an insider is a question of fact which will only be reversed if clearly erroneous. *Fabricators, Inc.,* 926 F.2d at 1466; *Paolella & Sons,* 161 B.R. at 118. Section 11 U.S.C. § 101(31) defines insider to include:

(B) if the debtor is a corporation—

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the partner is a general partner.

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor.

*Id.* The term "person" includes a corporation. 11 U.S.C. § 101(41).

The Bankruptcy Court found that Heisley was an insider. This finding is clearly correct considering that Heisley was the chairman of the board and chief executive officer of N/S during the period of the inequitable

658

conduct of which the appellants are complaining. Based on this finding the Bankruptcy Court went on to "assume, for purposes of our discussion, that we can collapse the Defendants and Heisley into a single entity which is, indeed, an insider of both entities." *Nutri/System,* 169 B.R. at 866. Although the Court doubts the efficacy of collapsing the appellees into one entity, it will do so for purposes of this discussion because, notwithstanding the stricter scrutiny applied to insiders, the Bankruptcy Court's finding that the appellants failed to prove inequitable conduct was correct.

■ Although there is no precise definition of inequitable conduct under the first part of the *Mobile Steel* test, courts have identified three general categories of misconduct which may constitute inequitable conduct: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego.

■ The conduct that the appellants complain of all occurred post-petition. The appellants have not cited one case, nor has the Court's research located any, that applied equitable subordination to post-petition conduct. The appellees translate the lack of case law into meaning that the section should not apply to post-petition conduct. However, the language of § 510(c) in no way indicates that it does not apply to post-petition conduct. Accordingly, this Court will not write such a limitation into the statute, for that is the duty of Congress. The Court does acknowledge that all the protections and parties which come into play once a debtor enters bankruptcy—*i.e.* the bankruptcy court, secured and unsecured creditors, a trustee—make the occurrence of equitable subordination based on post-petition conduct unlikely.

The appellants' claim of inequitable conduct under § 510(c) mirrors the claims they made in arguing that the Court should pierce the corporate veil. As found above, the appellants failed to present evidence that the appellees were controlling the debtors in an attempt to engineer a nefarious scheme to avoid having to pay administrative rent. *See supra* at 654–56.

Without any evidence of a scheme which might rise to the level of misconduct necessary for an insider under the first prong of the *Mobile Steel* test, the appellants fall back on their argument that the violations of 11 U.S.C. §§ 356(d)(3) and (4) were caused by the appellees and were inequitable conduct that falls within the ambit of the first prong of the *Mobile Steel* test. The Court need not repeat the reasons why the appellees cannot be found liable for a violation of § 365(d)(3), for they are fully explained at pages 655–56 *supra.* In addition, as in the context of the alter ego discussion above, the Court finds that to the extent the appellees were responsible for an unintentional, *de minimis* violation of § 365(d)(4), such an unintentional violation does not rise to the level of inequitable conduct warranting subordination. Accordingly, the Bankruptcy Court did not err when it found that equitable subordination was not appropriate in this case.

### D. *11 U.S.C. 506(c)*

■ 11 U.S.C. § 506(c) states:

The Trustee may recover from property securing an allowed secured claim all reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Although the statute states that only a trustee may recover under this section, it is well-settled in the Third Circuit that a creditor or an administrative claimant may bring a claim under 506(c). *See In re McKeesport Steel Castings Co.,* 799 F.2d 91 (3d Cir.1986).

■ In order to recover under § 506(c) a claimant must demonstrate that: (1) the expenditures or services were necessary to the preservation or disposal of the property; (2) the amount of the expenditure was reasonable; and (3) the expenditures provided a **direct** benefit to the secured creditors. *See In re C.S. Associates,* 29 F.3d 903, 906 (3d Cir.1994); *In re Orfa Corp. of America,* 170 B.R. 257 (E.D.Pa.1994). "Whether expenses are reasonable, necessary, and have benefitted the secured party are factual issues that rest with the sound discretion of the trial

judge." *Orfa Corp.,* 170 B.R. at 271. The burden of proof is on the claimant. *Id.*

■ The above-enumerated test may be fulfilled if the claimant can prove that the secured creditor consented to the expenditures that the claimant is seeking to recover. *Id.* at 272; *see also In re Birdsboro Casting Corp.,* 69 B.R. 955 (Bankr.E.D.Pa.1987); Lawrence P. King, 3 Collier On Bankruptcy (15th ed. 1993 ¶ 506.06 at 506–61–62. The claimant must show that such consent was clear and unequivocal and was specifically directed at the expenditures that the claimant is seeking to recover. *See In re Combined Crafts Corp.,* 54 B.R. 294, 299 (Bankr. W.D.Wisc.1985). In rare instances, a secured creditor's consent may be implied from its actions. *In re Flagstaff Foodservice Corp.,* 739 F.2d 73 (2d Cir.1984); *In re Bob Grissett Golf Shoppes, Inc.,* 50 B.R. 598 (Bankr.E.D.Va.1985). But, implied consent "is not to be lightly inferred." *Flagstaff,* 739 F.2d at 77. This consent-based test is commonly referred to as the "subjective" test, while the three-part test enunciated in the preceding paragraph is commonly referred to as the "objective" test.

■ The appellants' last claim is that the Bankruptcy Court erred in not finding that the appellants were entitled to a surcharge on the collateral for the Bank Group's secured debt pursuant to § 506(c). The appellants have confined their argument under § 506(c) to the subjective tests.[10] Once again, this claim is based on the notion that the appellees controlled the debtors and the Bank Group's senior secured debt. The Bankruptcy Court explained this claim aptly as "[a]lthough, the Landlords acknowledge that the Heico Defendants did not control the Bank Group, they assert that the Heico Defendants controlled the Bank Group's senior secured claim. Thus they contend that the 'true' claimant(s) (the Heico Defendants) under that claim consented to the Landlord services which would benefit what the Heico Defendants knew would become their collateral, when they caused the debtors (1) to not

reject the Landlords' leases during the initial 60–day breathing spell of § 365(d)(4); and (2) to file the lease extension motions." The Bankruptcy Court found the appellees' theory of recovery to be too tenuous to support a finding of implied consent. This Court agrees.

In order to avoid repetitiveness, all that must be said is that consent cannot be found in this case in the absence of a finding that the appellees controlled the debtors and the Bank Group's senior secured debt. Because the Court has found that the Bankruptcy Court did not err in finding that such control was not proven, the Bankruptcy Court's finding that appellants failed to prove implied consent must be, and is, affirmed.

---

**10.** To the extent that the argument presented in section VI(A)(3) of the appellants' brief represents an attempt to recover under the "objective" test, the Bankruptcy Court's finding that the Ap-

pellants' failure to present even a scintilla of evidence regarding the benefit allegedly imparted upon the Appellees' bars recovery under the "objective" test is found not to be clearly erroneous.